The People ex rel. Benjamin K. Phelps, Defendant in Error, *v.* The Court of Oyer and Terminer of the County of New York, Plaintiff in Error.

In an indictment under the statute for obtaining a signature to a written instrument under false pretenses, it is not essential to set forth all the details of the fraud, it is sufficient to specify particularly the pretenses, to aver their falsity and the fraudulent intent, and to show how they were effectual in accomplishing the fraud.

If the false pretense averred and proved is capable of defrauding it is sufficient, and this must be determined by the circumstances of each particular case.

Such an indictment may be based upon a false claim of indebtedness

against a municipal corporation ; and if it appear that the claim was presented under circumstances and in such manner as was calculated to deceive the municipal officer whose duty it was to act thereon, and that his signature was thus procured, a conviction will be sustained.

The question in such case whether the false pretense was calculated to deceive and was capable of defrauding is one for the jury.

In an indictment, therefore, charging the accused with obtaining the signature of the mayor of the city of New York to a warrant drawn on its chamberlain by false pretenses, to wit : by means of a false and fraudulent bill, set forth in the indictment, represented by the accused to be a just and true account, and that the city was justly indebted to the person in whose name the account was presented against the city. *Held*, that it was not necessary to set forth how the fraudulent account operated to deceive through the action of the intermediate agents of the corporation ; that the manner in which the false representation reached the mayor was matter of detail belonging properly to the evidence on trial.

Upon the trial the mayor testified that he had no distinct recollection of what occurred at the time he signed the warrant, and knew that he signed it simply because his name was affixed to it, it appeared that the bill in question was delivered to him; he was then allowed to testify to the routine of business in his office. *Held*, no error.

It appeared from this evidence that while the mayor did not read or examine each voucher which accompanied the warrants presented to him to sign, he required their presence and was induced to sign by the presence of the bill and by the approval thereof by the proper officers. *Held*, that this authorized the submission of the question to the jury as to whether the presence of the bill was one of the inducements to the signature ; that its bare presence although neither examined nor read by the mayor was a false pretense.

It is not necessary to sustain a conviction in such case, that the false pretense was the sole inducement to the act of the party defrauded.

Nor is it material that the bill went through the hands of other and independent officers before reaching the mayor, who might have stopped its progress; and this whether they were misled by the fraud of the accused or obeyed his orders.

It is not necessary that words should be spoken or written to create a false representation ; a mute or silent act may convey the falsehood, and if it does, it constitutes the offense.

It appeared that a duplicate of the bill was, in accordance with the custom in the municipal offices, prepared and accompanied the original bill when presented to the mayor. *Held*, that this fact and that the duplicate might alone have produced the result, was immaterial, as it was but part and parcel of the false pretense for which the prisoner was responsible.

A juror was challenged by the prisoner for principal cause and to the favor; he testified in substance that he had read in the newspapers of great frauds

perpetrated against the city; that he had read of the prisoner's case and had formed in some degree an opinion in regard thereto, which he had yet, and it would require evidence to remove it; but that his opinion was contingent, founded on an assumption of the truth of what he had read, which he had not investigated; that his opinion was the general impression a man derives from reading a statement in a newspaper; that he verily believed he could render an impartial verdict and that his previously formed opinion would not bias or affect such verdict, nor would he be influenced at all on the trial thereby; that if put upon the jury he would discard his opinion and decide upon the testimony, and in that event it would not require evidence to overcome his opinion, and he would try the case without being influenced by it. The challenges were overruled and the juror was then challenged peremptorily. After the full number of peremptory challenges had been exhausted another juror was called, whom the prisoner's counsel proposed to challenge peremptorily upon the ground that they had been unlawfully compelled to exhaust challenges by the alleged erroneous decision of the court as to the competency of said juror. The court denied the right to further peremptory challenges. *Held,* no error; that if the question could be thus raised, as to which *quære,* the ruling as to competency was correct and the exhaustion of the peremptory challenges was not compelled by any error of the court.

*Greenfield* v. *The People* (74 N. Y. 277), distinguished.

A party seeking to elicit new matter constituting an element of his case, upon cross-examination of a witness produced by the opposite side, has not the right to put leading questions; as to such new matter the witness becomes his own.

The range and extent of a cross-examination is, as a general rule, within the discretion of the court, subject to the limitation that it must relate to matters pertinent to the issue, or which tend to discredit the witness or impeach his moral character.

Where this limitation has been regarded, this court cannot interfere, save where there has been an abuse of discretion.

(Argued December 15, 1880; decided January 18, 1881.)

ERROR to the General Term of the Supreme Court in the first judicial department, to review an order made March 1, 1880, affirming a conviction of Henry W. Genet, in the court of Oyer and Terminer in and for the county of New York, of the crime of obtaining a signature to a written instrument by means of false pretenses.

The court of Oyer and Terminer suspended sentence upon the conviction, and the case was brought before the General

Term of the Supreme Court by certiorari issued in pursuance of the statute, on petition of the district attorney.

The substance of the indictment and the material facts appear in the opinion.

*Nelson J. Waterbury* for plaintiff in error. The court erred in refusing to allow the peremptory challenge and challenges to favor to the jurors Ross, Blagden and Evans. (*People v. Bodine*, 1 Den. 281, 305, 308 ; [1 Inst.] 157 b.; 1 Chit. Cr. Law, " 544, 549 [4th Am. ed.]; 1 Trials per Pais. 195 ; " *Thomas v. The People*, 67 N. Y. 218, 222 ; *Greenfield v. People*, 74 id. 277, 283; *Freeman v. The People*, 4 Den. 9 ; *People v. Honeyman*, 3 id. 121; *People v. Thompson*, 41 N. Y. 1; *O'Brien v. The People*, 36 id. 276 ; *Cancemi v. The People*, 18 id. 128, 138; *Taylor v. Porter*, 4 Hill, 140 ; *Wynehamer v. The People*, 13 N. Y. 378; 4 Bl. Com. 353 ; 2 Dev. & Batt. 205 ; 4 Ohio, 350.) The attempt to prove by the cross-examination of the accused that he had been guilty of misconduct other than that alleged in the indictment was error. (*Stover v. The People*, 56 N. Y. 315, 320 ; *People v. Brown*, 72 id. 571, 574.)

*W. A. Beach* for plaintiff in error. The evidence does not present a case of false pretense within the statute. (*The People v. Gates*, 13 Wend. 311 ; Bouvier's Dict., title " False token"; *The King v. Lara*, 6 Term. 565 ; *The People v. Babcock*, 7 Johns. 201, 204; Archbold Cr. Pr. by Waterman, [7th ed.], 617, margin, 466, note ; *Ranney v. The People*, 22 N. Y. 413, 416 ; *Rex v. Cadington*, 1 Car. & P. 661 ; *Rex v. Pyrvell*, 1 Stark. N. P. C. 402 ; *Regina v. Evans*, 9 Cox, C. C. 238 ; 2 Bishop on Criminal Law, 406 ; *Rex v. Leonard*, 2 Car. & P. 514 ; *Rex v. Mitchell*, 2 East's P. C. 830 ; *Rea v. Barnard*, 7 Car. & P. 784 ; *Rea v. Storey*, R. & Ry. 81 ; *Daniel K. Allen's Case*, 3 City H. R. 118 ; *James Conger's Case*, 4 id. 65, 69 ; *Commonwealth v. Drew*, 19 Pick. 179 ; *People v. Haynes*, 14 Wend. 558 ; 2 Wharton's Cr. Law, § 2107 ; 2 East, C. P. Cr. 18, § 2, p. 819 ; *Greenleaf v. Munford*,

19 Abb. 469, 475–6; *Lynch's Case*, 1 City H. Rec. 138; *The People* v. *Williams*, 4 Hill, 9; *The People* v. *Adams*, 3 Den. 190 [S. C.], 1 Comst. 173; *Regina* v. *Gardner*, 7 Cox, C. C. 136; 2 Bish. on Cr. Pro., § 180; *People* v. *Gates*, 13 Wend. 311, 322; *People* v. *Chapman*, 4 Parker, 56; *United States* v. *Cruikshank*, 2 Otto, 558, 562; *Bradlaugh* v. *The Queen*, 5 Rep. 701.) To be indictable, the false pretense must have exerted a material, if not controlling effect in procuring the mayor's signature. (*People* v. *Crissie*, 4 Den. 525; *People* v. *Haynes*, 11 Wend. 557; *Clark* v. *The People*, 2 Law. 329; 2 Bishop on Criminal Law, § 438.) The court below erred in refusing to defendant the right to prove the "purpose" of Davidson in preparing the bill. (*Kerrains* v. *People*, 60 N. Y. 221; *Armstrong* v. *People*, 70 id. 33; *Tracy* v. *McManus*, 58 id. 257; *Ins. Co.* v. *Hachfield*, 73 id. 226; *Superintendent* v. *Herkimer*, 44 id. 22. It was error to deny the defendant the right to put leading questions on the cross-examination of Davidson. (*The Phila. & T. R. R. Co.* v. *Stimpson*, 14 Pet. 448, 461; *Houghton* v. *Jones*, 1 Wall. 702; 1 Greenleaf on Evidence, § 445; *Jackson* v. *Varick*, 7 Cow. 238; S. C., on Error, 2 Wend. 166; *Fulton Bank* v. *Stafford*, id. 483; 1 Greenleaf on Evidence, § 477; 2 Phillip's Evidence [text], 401; 2 Cow. & Hill's Notes, 723, note 373; 2 Best on Evidence [Am. ed.], by Wood, § 641; Starkie on Evidence [9th ed.], 174, margin, 196.)

*Daniel G. Rollins* for defendant in error. The subsequent peremptory challenge to jurors waived the other challenges. (*Freeman* v. *The People*, 4 Den. 9; *Feery* v. *The People*, 2 Keyes, 442; *People* v. *Bodine*, 1 Den. 283.) Exception will not lie to an erroneous exclusion of a question as leading, the ruling being simply as to the form of the question and not as to the substance of the testimony. (*Walker* v. *Dunspaugh*, 20 N. Y. 170.) The testimony of the mayor as to the way in which his signature was obtained, given not from independent recollection of this particular transaction, but from his ordinary course of business as a public officer, was admissible. (1

Greenleaf's Evidence, § 40; Stephen's Dig. of the Law of Evidence [Am. ed.], p. 63.) The court properly refused to charge that defendant was not responsible for the bill after he handed it to the court-house commissioners, and that he might still be responsible if he committed the offense through an innocent agent. (*People* v. *Adams,* 3 Den. 190; *Com.* v. *Harley,* 7 Metc. 462; *People* v. *Adams,* 1 N Y. 173; *Comm.* v. *Call,* 21 Pick. 523.) The question of the materiality and influence of the pretense is always one for the jury. (*Thomas* v. *The People,* 34 N. Y. 551.)

FINCH, J. The writ of error in this case brings up for review the proceedings upon the trial of Henry W. Genet, charged with obtaining by false pretenses the signature of the mayor of the city of New York to a warrant, drawn on the chamberlain, and subsequently paid to the accused. The false pretense alleged in the indictment, and sought to be proved on the trial, consisted of a fraudulent bill, made out in behalf of one Davidson, and sent on its way through the hands of the city officials until it received the final signature of the mayor, and became thereby the means of obtaining the money. It is necessary to examine somewhat minutely the facts established, since it is very earnestly and forcibly argued that they wholly failed to establish the guilt of the accused.

The first proposition claimed to have been proven on behalf of the prosecution was, that Genet originated and dictated the false and fraudulent bill. The evidence on that subject is wholly confined to the two parties to the transaction. William M. Tweed, John McQuade and Josiah Porter were commissioners for building what was known as the Harlem Courthouse. Genet had been active and influential in procuring the necessary legislation to authorize its construction, and was the counsel of the commissioners. Davidson swears that, being in Albany and in Tweed's room, the latter suggested that iron work was wanted for the court-house. Davidson, being engaged in that business, seems to have been tempted by the opportunity, and sought Tweed's influence to procure a contract for him.

Tweed thereupon referred him to Genet, and afterward told the latter, as he testified, to see the contractor and architect, in relation to it, for Davidson must have the work. There was no formal contract made, no agreement as to quantity, price, or value, and no authority to make such contract, conferred upon Genet. What the latter did was something entirely different. On his statement of what was wanted Davidson prepared what he calls an "estimate," on the basis of which, avoiding all items and details, he made out a bill in the following form: "1871, January, February, March, April, May, June. To iron work, window frames, iron timbers, etc., etc., on contract as per agreement with commissioners, $4,710, cartage, $92," the whole footing up, $4,802. Davidson swears that the entire form of the bill was dictated by Genet, and that especially the months stated in it were expressly directed by him to be inserted. Genet, on the other hand, charges the preparation of the bill to Davidson, and says, by way of explanation, that the latter declined to furnish the iron work except on a stipulation that the money was to be paid on delivery, and this bill was prepared to enable Genet to procure the money and so be ready to meet the emergency. Davidson admits that he did make such a stipulation. But, granting the truth of that statement, what was it that these men were doing? They were planning a fraud upon the city. Confessedly they were constructing a false and fraudulent bill, the admitted purpose of which was to get from the city officials its amount upon the false pretense that a contract existed and had existed for six months with the commissioners for the supply of the material; that the same had been in fact supplied; that in the process of so doing the expense of cartage had been incurred; and that the stipulated price was due and payable. All this was what the bill imported; and was its plain meaning and distinct representation as broadly as we have stated it here. That representation was utterly and thoroughly false, and known by both parties to be false. Whatever may have been the ultimate purpose, one thing at least is certain. Both parties meant by simulating an honest bill to get from the city its amount upon the pretense

1881.] People ex rel. *v.* Oyer & Term. County of N. Y. 443

Opinion of the Court, per Finch, J.

and representation that the materials had been actually furnished when they had not been furnished at all. About this original purpose there can be no possibility of mistake. The framing and preparation of this bill can have no other explanation, and no other is attempted. The jury were at liberty to believe Davidson's version of the transaction, and if they did, it established a fact which of necessity throws light upon what followed, and becomes an important element in the solution of the serious questions which remain. The jury were justified in believing that the intended fraud originated with Genet, and was his especial project. Nobody would meditate such a plan, or deem it for one moment practicable, except one thoroughly familiar with the business routine of the city, capable of influencing its officials, and especially, reasonably confident of his ability to procure the assent of the court-house commissioners and the contractor to a claim without foundation in fact. Davidson was not so situated. It is incredible that he should have deemed such a fraud so capable of success as to originate and propose it. Genet's position was different. With his relations to the commissioners and the contractor, which we shall soon see were peculiar, and gave him great control and abundance of opportunity, the project became, at least, possible and within the range of success. Of the two men, one of whom must have originated and planned the fraud, every probability and all the surroundings point to Genet. The proposition must, therefore, be taken as established that he originated and planned a fraudulent scheme by the false pretense of a seemingly honest bill to get from the city the amount of that bill through the necessary routine, when in truth no debt or liability existed.

The next step in the proof relates to the execution of the plan. The prosecution claim to have established that Genet took the fraudulent bill, which in the case is known as the " blue paper bill," to the commissioners of the court-house; procured their certificate of its correctness ; obtained the written approval of Scallon, the contractor ; delivered it to Carson, who was the secretary of the commissioners; and directed

that it be sent, with these marks of honesty upon it, to the comptroller for the purpose of being audited, and terminating its mission in a warrant which would produce the money. There is no direct evidence of all these facts. Genet admits that he took the bill to one of the commissioners or to Carson, but denies having given any directions. Circumstances, however, speak very strongly and sometimes lead to inevitable inferences. How came the commissioners to certify this bill? The court-house had hardly got beyond its foundations. This iron work was apparently not yet needed. The commissioners controlling this construction may fairly be supposed to have known that no such material as was charged for in the bill had been furnished. One thing at least they did know. The bill said, " as per contract with the commissioners." Assuredly they knew that statement to be false. They had made no such contract. Even Genet does not pretend they had. And did not Scallon know? He was the contractor, the builder of the structure. He certainly knew; it is impossible to believe that he did not know, that this bill was wholly false and a sheer fabrication. How came he to certify its correctness? He had no interest to put his name to such a fraudulent voucher, unless some one induced him to do it; and that person must have been one having great power and influence over him. That could have been no one but Genet. The evidence gives us plain traces of the extent and power of his influence over these persons. He was, if not the originator, at least the early and persistent advocate of the new building. He was the counsel of the commissioners. Almost $100,000 of the public money appropriated to the work in progress, by some means, in some way, went through his bank account. His relatives were drawing salaries in positions under the commissioners obtained through his influence. Scallon was in his employ and engaged in building for him a costly house, and probably owed him much of service and gratitude. These facts again point to Genet as the agent effecting the result. It took some influence and power to make these men lend themselves to such a fraud. Genet possessed it. He had the motive,

for this was but a necessary step in the execution of the original plan which, as we have shown, he prepared. The question was fairly submitted to the jury whether Genet delivered this bill to the commissioners for their approval and with directions that it be sent to the comptroller for audit. It did not go there of itself alone. The motive and the force behind it was Genet. So the jury found, and there was evidence and a rational basis for their conclusion. We must assume, therefore, as sufficiently proved and fairly found, that Genet, after procuring the certificates of the commissioners and the contractor, directed this false bill to be sent to the comptroller for the necessary audit.

The next proof on the part of the people relates to that audit. The proposition asserted is that Genet, having caused this bill to be sent to the comptroller, requested the auditor to certify to its correctness, the comptroller to draw a warrant for its amount, and the mayor to countersign that award; and that these officials did so, relying upon the false representations of the bill, and trusting to their truth. The case is plain enough so far as the action of the auditor and comptroller are concerned. Carson, in preparing this bill for their audit, made out a duplicate of it upon a blank furnished by the comptroller's office, the purpose of which blank was to secure as far as possible desired uniformity in the vouchers to be put on file. This duplicate, known as the "white paper bill," varied somewhat in form from the original bill, but in substance repeated its false representations and was practically a copy of it. There was no falsehood in the one that was not in the other. The formal voucher too on its face and in terms referred to the other by the words "as per annexed bill." Was the blue paper bill so annexed? Again there is an absence of direct evidence but a series of circumstances point to the truth. What would Carson, who made this duplicate, be certain to do? He either believed the bill to be honest or dishonest. If he thought it honest, when he prepared the new voucher referring to the other as "annexed," he would naturally annex it. That would be regular and proper and saying that it was annexed we must presume that he did it. If he knew or suspected it was dis-

honest, which is most likely, he would be even more sure to annex it. Its absence would be certain to attract the very notice and criticism necessary to be avoided. But the proof goes further. None of the officials in the comptroller's office recollect these bills or the circumstances attending their audit. Some of them do indeed say that both papers were before them, but a cross-examination develops that the statement depends, not upon memory, but upon reasoning, and inferences drawn from the routine and habit of the office. The deputy comptroller tells us that, as a general thing, the original bills were fastened to the duplicates furnished by the office; that they endeavored to carry out that arrangement but it was not always done, and that in a case like the present, where the "white paper bill" referred to the original as annexed, he should question it as a complete voucher if the original bill was absent. The warrant clerk swears that he filled in the warrant from the two papers, and that both were before him when he did so, but he afterward explains that this is matter of judgment with him from the two facts that the amount of the bills and of the warrant, as also the numbers of both, correspond. The auditor testified that he had no specific recollection of the presence of the original bill, but when asked what would have been his action when he saw the duplicate was made out " as per annexed bill," he answers that he would have had to get the bill referred to as annexed, and would not have signed his name without it. Another circumstance appears and adds its weight. The mayor, at the trial, pointed out upon the original bill of Davidson, " the blue paper bill," the initials of W. H. Wiggins, the book-keeper of the comptroller; a fact which indicates very clearly that such original bill was present in the comptroller's office, and leaves it reasonably certain that it was annexed to the white paper duplicate. In that condition the complete voucher received the stamp and signature of the auditor, the comptroller drew and signed the corresponding warrant, and voucher and warrant went to the mayor for his final signature. As it has been satisfactorily shown that both the original bill and its white paper duplicate were before the auditor, and the

further fact is distinctly proved that thereafter no change was ever made in a voucher, it follows that the two bills were both before the mayor when his final action was taken. All the facts and every circumstance point to that as the truth, and the jury were entirely justified in concluding that both bills, constituting a complete voucher, were before the mayor when he countersigned the comptroller's warrant. The mayor's mental processes at the moment of that signature were the subject of examination and cross-examination. His own statement of them is calculated to aid the inferences to be drawn, but is not necessarily conclusive. Both court and jury may consider the facts and draw from them the just and legitimate conclusion.

It is quite evident that the mayor had no independent recollection of the particular transaction. He knew he signed the warrant, for the papers were shown him, and he recognized his signature. What else he says is drawn from the routine of his office, and his memory of the modes and reasons of his action. The routine, he describes thus : " a warrant would reach me, not in the shape you first hand it to me, but with a paper or papers pinned, or in some way annexed to it ; they would be papers which I believed to be vouchers representing specifications of the general description written on the face of this warrant. * * * There was always what I believed to be a voucher, and assumed to be a voucher, because of a stamp on the back. * * * I would not have signed the warrant, unless I believed the paper annexed to it was a voucher specifying the entry in the minute. * * * My reliance was upon the signature of the comptroller and of the auditor, and as I have stated before, without any examination. * * * I recollect from the general course of business I never signed a warrant detached except for salaries. * * * I certainly would never have signed any warrant if I had not believed on the faith of the comptroller's approval, and auditor's examination that the description of the claim or debt was honest, and the papers, if any, on which it was founded, examined by them were honest. * * * The signatures of the auditor and

comptroller indicated that it was an honest and true bill and I believed on their belief." This is the substance of the mayor's evidence. Through all the variations of question and answer it came down to two things; that he would not have signed without the presence of the voucher; and for its accuracy and honesty he relied entirely on the examination and certificate of the auditor and comptroller. This evidence raises the grave and serious question in the case. Before considering it one other fact needs to be stated, for the light it throws backward on the transaction. After the mayor had countersigned the warrant, it was returned to the comptroller's office, and Genet, as he says happening to hear it was there, asked for and received it, acting as the authorized agent of Davidson, and soon after indorsed it in the latter's name, and drew the money. We find the accused at the beginning and the end of the transaction. He who planned the artifice is found at the end of the chain of events possessing himself of the fruits of the fraud. What he originally intended was in fact accomplished.

We have thus sought to recall the proofs in order to test more intelligently the objections raised to their sufficiency which are many and serious.

At the outset, the indictment is assailed. It is claimed that the false pretense is insufficiently pleaded, and that the details of the fraud, showing how it operated to deceive through the action of the intermediate agents, should have been stated. Undoubtedly it is the rule that the indictment must specify at length the particulars of the fraudulent representation and show how it was effectual in accomplishing the fraud; it must be explicit enough to support itself, and must relate an intelligible story. (*The People* v. *Gates*, 13 Wend. 311.) But the pleading before us does not violate that rule. It alleges the false pretense particularly and explicitly. It states that the defendant pretended and represented to the mayor that the city was justly indebted to Davidson in the sum of $4,802, for materials furnished for the ninth district court-house by said Davidson, and that his bill for the same, a copy of which is recited, was a true statement of the account; and that

1881.] People ex rel. *v.* Oyer & Term. County of N. Y. 449

Opinion of the Court, per Finch, J.

Davidson had supplied the iron work and materials and the cartage, and the city had received the same for its proper uses. The indictment then avers specifically and separately the falsity of each of said representations, and the fraudulent intent with which they were made, and that thereby the mayor was induced to sign and deliver to Genet, the warrant drawn on the chamberlain. The allegations show sufficiently the character and circumstances of the false pretenses and how they were effectual to accomplish the fraud. It was said in *Thomas* v. *The People* (34 N. Y. 352), that it is sufficient to state and to negate one false pretense in an indictment, and if the pretense is "capable of defrauding," that is sufficient. The allegation that the accused pretended and represented to the mayor is sufficient without averring the channels or route by which the representations reached him. That is matter of detail and belongs properly to the evidence. (*Skiff* v. *The People*, 2 Park. Cr. Rep. 139.) We think the indictment sufficiently stated the material circumstances of the accusation.

The argument in behalf of the accused then alleges the insufficiency of the facts proven upon the trial. We are reminded that a mere private cheat is not within the statute, and that the false pretenses must be such as are calculated to mislead ordinary prudence and caution. The rule has been stated in that form. (*People* v. *Williams*, 4 Hill, 9.) But since the law was intended to protect the weak and credulous as well as the careful and intelligent, and since the materiality and influence of the pretense is for the jury to determine from the evidence (*Thomas* v. *The People, supra*), it is perhaps quite as accurate to say merely that the pretenses must be calculated to deceive, leaving that to be determined from the circumstances of each particular case. If the pretense is capable of defrauding that is sufficient. (*Reg.* v. *Woolley*, 4 Cox's C. C. 193.)

It was argued, however, that the pretenses proved against the accused were not of that character for the reason that they consisted of a false claim of indebtedness due from the alleged debtor, and it is said that one who makes such claim to a debtor who must be assumed to know that he does not owe

the debt, cannot be said to have induced the payment by his unfounded demand. That may be true of the case supposed and yet not be true of the one before us. The alleged debtor in this case is a municipal corporation. It can act only by and through its appointed officers and agents. It cannot be assumed that they would necessarily know in every instance that a debt claimed to be due from the city was without foundation. Indeed the very guards and precautions thrown around the allowance and audit of bills against the city, shown by the evidence in the case before us, indicate a consciousness of the danger of deceit and fraud. But in any event the question whether the false pretenses of Genet were calculated to deceive, and were capable of defrauding was a question for the jury. They have found it against the accused, having before them all the circumstances proved upon the trial and we can see no just reason for reversing that decision. As matter of fact it *did* deceive; it *did* induce the audit and approval of the comptroller's office; and in the face of that fact it is impossible to say that the false bill was not calculated to deceive or incapable of defrauding.

But we reach now a more difficult question. The charge in the indictment is for procuring the signature of the mayor to the warrant. Unless that fact is proved, no crime is established. The jury by their verdict have found that the mayor's signature was induced by the fraudulent representations of Genet, and the precise question raised is whether there was any evidence to sustain that finding.

That there was none is maintained by the learned counsel for the appellant mainly upon three grounds: *first*, that the original or "blue paper" bill was not proved to have been delivered to the Mayor; *second*, that his entire statement was founded solely upon the routine of his office, and the evidence of such routine was incompetent; and *thirdly*, that the proof shows conclusively that the mayor relied wholly, as the inducement to sign the warrant, upon the audit and signatures of the auditor and comptroller, and not at all upon the false voucher which he did not even examine.

The first objection has already been determined against the appellant by our conclusion upon the facts that the evidence warranted a determination that the "blue paper" bill was before the mayor and formed part of the complete voucher delivered to him with the warrant. The second objection has been ruled adversely by the authorities. In *The People* v. *Gates* (13 Wend. 311, *supra*) the precise question was raised. There, as here, the witness had no distinct recollection of what transpired when he signed the paper and knew that he signed it only because his name was affixed to it. There, as here, his further evidence was based wholly upon his official routine, to which objection was made. The court held the evidence competent, saying : "The tendency of the testimony was to prove the defendant's guilt. If the witness never signed any such bond but what was presented to him by the defendant, and the defendant in all cases made the representations alleged, and the witness did sign the bond in question, and it was presented by the defendant, this is nearly or quite tantamount to saying that the defendant on the present occasion made those representations." The evidence of the mayor, therefore, as to the routine of his office, was competent, and brings us fairly to a consideration of its effect, which is the third and serious ground of objection remaining to be considered. The argument in its support is a critical and close analysis which separates the transaction into its component parts and presents for our study, one at a time, the separate links of the disconnected chain. Waiving for the present the effect of uniting the severed links, let us follow the argument as presented.

The mayor did not read or examine the voucher which accompanied the warrant. It is certain therefore, that he was not moved by a knowledge of its contents. What did move him, it is said, was solely and alone the signature of the auditor and comptroller, and these were not Genet's act but the independent audit of independent officers, performing a duty imposed upon them by the law. And it is further suggested that the reliance of the mayor upon the audit would have led to his signature if the "white paper bill" alone had been present,

and that was the act of Carson and not of Genet. It is undoubtedly true that but two things operated to induce the action of the mayor, and these were first, the presence of a bill against the city which could be the subject of approval and payment; and, second, the actual approval indorsed and attending it of the proper officers. These two influences acted concurrently to produce the result. The presence of the bill or claim alone would not have been sufficient, nor without that would the signature of the comptroller or of the auditor, for the mayor expressly says that he never signed a detached warrant or one unaccompanied by a bill which he assumed to be the subject of payment, except in the case of warrant for the payment of salaries. Each of the concurring causes was material to the result, and it is therefore idle to speculate upon the relative importance of either. Each was a necessary and operative inducement to the resultant signature, and if either was the act of Genet, if either came to the mayor, impelled and moved by the accused, the false pretense is his, and produced the final result. For it is not necessary to sustain a conviction that such pretense should be the sole inducement to the act of the party defrauded. (*People* v. *Haynes*, 11 Wend. 557.) If that were so it would be impossible to convict, for in nearly every case some elements of truth are mixed with the falsehood, and make the latter more dangerous. If the false pretenses had a material effect in producing the result that is sufficient, even though such pretenses were intermingled with other and truthful elements. If, therefore, in this case, the bare presence of the false voucher was a material inducement to the signature of the mayor, which is sufficiently proved, it leaves open only the inquiry whether it was there by the act and agency of Genet, and was a false pretense within the statute. We have already said that the evidence sufficiently shows that the original bill framed and dictated by Genet, was before the mayor as part of the complete voucher, and came there by his impelling act and direction. That it went through other hands can make no difference, nor that the intermediate agencies were inde-

pendent officers who might have stopped its progress. (*People* v. *Adams*, 3 Den. 190; 1 N. Y. 173; *Com.* v. *Harley*, 7 Metc. 462; *Com.* v. *Call*, 21 Pick. 523; *Rex* v. *Brisac*, 4 East, 164.) These were all cases in which the false representation or writing reached the victim through the intervention of innocent third persons. However indirect or circuitous the channel by which it reaches its destination, when there, the person who gave it its direction and aim is also there by the instrument used to effect his purpose. Its bare presence, although neither examined nor read by the mayor, was a false pretense. It did deceive him; it did procure his signature; it said to him by its mere presence that it was an honest claim awaiting payment, when, in truth, it was a bold ·fraud, simulating honesty to procure a warrant for a sum, no part of which was due. It is not always necessary that words should be spoken or written to create a false representation. A mute or silent act may effectively convey the falsehood, and if it does the consequence and the crime are the same. The defendant in *Rex* v. *Barnard* (7 Car. & P. 784) who assumed the garb and peculiar dress of a commoner at Oxford, and thereby procured credit, if he had uttered no word of falsehood, it was held would have conveyed the lie as effectually, and wronged his victim as thoroughly, as when saying he was a student of the university, and both honorable and responsible. Nor does it change the situation that the duplicate or "white paper bill" was also there, and might alone have produced the result. It was the same, identical, false representation on another paper and in another shape, but equally false and aimed at the same result. If, indeed, that had been a separate representation, framed by somebody else, and for which Genet was in no manner responsible, a different question might arise. But it came to the mayor attached to the original bill, and in terms referring to it, and simply copying its falsehoods. It thus became part and parcel of the false pretense for which Genet was responsible — his repetition of the falsehood annexed to the original. Analysis may separate them, but, in fact, they con-

stituted but one false representation, having but one origin and accomplishing but one purpose.

But it seems to us there is another light in which the questions raised may be viewed, and leading, perhaps, to clearer results. The complete transaction taken together, studied as a whole, may materially assist the effort to reach a just and satisfactory conclusion. It may not be doubted that if Genet framed this bill for the purpose, and with the intent, of fraudulently passing it through the known and understood routine to payment; and in the execution of that purpose procured through his personal influence the certificates of the commissioners and the contractor; then gave it to Carson with directions to make out a duplicate and. attach the original and send it to the comptroller; thereupon requested the auditor to stamp it as correct and the comptroller to draw his warrant, assuring both that the bill was correct and true; and next requested them to send warrant and bill thus certified to the mayor for his signature; and finally followed them to the latter's office and telling him that the bill was honest and had been certified accordingly, requested the mayor to countersign the warrant, which that official did; if, we repeat, all these things had occurred consecutively, in their order, it may not be denied that a clear case would have been established against the accused of obtaining the final signature of the mayor to the warrant by false pretenses. Exactly this was what occurred except in the one fact, which may, indeed, be gravely important, and challenges our attention, that Genet did not personally and in words request the auditor and comptroller to audit and then send the bill to the mayor; and did not personally and in words request the latter to sign; and did not personally and in words assure each that the bill was correct and honest. If that difference is rather formal and on the surface than real and substantial, the main question on this appeal is answered. It has already been shown that the evidence justified the conclusion that Genet directed Carson to send the bill and duplicate to the comptroller for the purpose of audit and payment, and that this was done in the execution of an original plan to secure that payment by this process. What

that process was, the character of the routine, it is reasonable from Genet's own testimony to believe he perfectly understood. He was a frequent, almost daily visitor, at the comptroller's office; had collected for other persons warrants in the usual form for very large amounts, and collected in that way a great many bills; had been a member of the common council and was the attorney of the court-house commissioners. When, therefore, he dictated this bill, when he got it certified by commissioners and contractors, and directed it to be sent to the comptroller, he knew all that was involved in that direction, and the natural and necessary consequences of his act. For such consequences every man is responsible. Nothing is better settled than that. Genet knew that if he sent that bill to the comptroller's office the act would be understood to mean the assertion of an honest claim against the city, and a request that it be audited, and a warrant drawn for its amount. When he sent it there it follows that by the act he did assert the honesty of the claim, and did request the audit and the warrant. He could not have understood, or intended any thing else. He knew further that after such audit and the signing of the warrant, both would be sent to the mayor, and that, by that act the mayor would be assured that the claim was just, and that, therefore, his signature was requested to the warrant. This consequence of Genet's act he both clearly foresaw and actually intended. It resulted from his original act, and he meant that it should so result. The comptroller and auditor, public officers though they were, became through his act and deception, the innocent agents of his fraud upon the mayor. What they did was at his request and by his direction as much as if he had been personally present, for the act was within his original purpose and contemplation, and occasioned, and in legal effect, directed, by him. When they said — misled by his fraud, or obeying his orders — it matters not which, that the account was honest, it was Genet who said it through them; and when they asked for that reason for the mayor's signature, it was Genet who stood there asking, and who procured it to be made. The man who turns an engine valve upon a steamer, through the inter-

mediate agency of cylinder, piston, and walking beam, and shaft and paddle wheel, gives motion to the boat. It is no answer to say here that the intermediate agencies were not mere machines, obeying irresistible force, but independent and self-acting agents, not chained to Genet's will, and obeying necessarily his impulse; because, by his deception, he controlled and mastered that independence, and made it do his bidding. From first to last, therefore, every step taken was the product of his will and guided by his purpose; and when at the end he received the comptroller's warrant he had simply accomplished a purpose intended at the outset, through agencies operating under the influence of his fraud and, therefore, in obedience to his will. He, himself, by the false pretense of the Davidson bill, made all the more seemingly honest by certificates and audits procured by him, obtained the signature of the mayor. This is the plain truth of the transaction; the obvious inference to be drawn from it, and the verdict of the jury, sustained by it, is conclusive upon us, and cannot be reversed. The case was fairly submitted on this theory. Its separate elements were one by one and in careful detail commended to their attention. While in some respects direct proof was wanting the circumstantial evidence was strong and convincing. The verdict, therefore, must stand upon the facts, taken as a whole, and in their completeness, and is conclusive upon this appeal.

The same thing is to be said as to the further question of Genet's fraudulent intent. The evidence plainly warranted a finding of that fact, apart from his explanation and denial. The jury listened to that, and with all the facts before them disbelieved it. They had the right to do so; the duty and the responsibility were peculiarly theirs; and we can see no ground upon which we are at liberty to review their conclusion.

The further questions in the case grow out of the conduct of the trial.

Three jurors were challenged by the defense for principal cause, and to the favor, and were decided to be competent, and an exception to such decision was in each instance taken.

Each of these jurors, after such ruling, and exception, was challenged peremptorily by the defense. After the full number of their peremptory challenges was exhausted, another juror was called and examined, whom the defense proposed to challenge peremptorily, claiming the right to do so, notwithstanding their full number was exhausted, upon the ground that they had been unjustly and unlawfully driven to exhaust such challenges by the erroneous decision of the court in favor of the competency of the three jurors previously challenged for cause. The court ruled adversely, and denied to the defense any further right of peremptory challenge. The question raised is an important one, but is not before us, if the ruling as to the three jurors was correct. In that event the use of their peremptory challenges by the defense was of their own free choice, and in no manner compelled by any error of the court. It is not needed that we separate the cases of the three jurors, for they were in all material respects alike, except that in the case of Toplitz, the last of the three, the grounds of objection were most sharply defined, and rested upon the strongest foundation. All three of the jurors had read in the public newspapers accounts of great frauds perpetrated against the city, and had been more or less affected by what they had read. The juror Toplitz, on his examination by the counsel of the accused, said, that he had read of the Genet case in the newspapers ; had formed in some degree an opinion in regard to it ; had that opinion yet ; and it would require evidence to remove it. In answer to inquiries on behalf of the prosecution he explained ; that his opinion was contingent and hypothetical and founded on an assumption of the truth of what he had read, which he had not investigated ; that such opinion was the general impression which any man derives from reading a statement in a newspaper ; that he verily believed he could render an impartial verdict and that his previously formed impression or opinion would not bias or affect his verdict ; that he thought he would not be influenced at all on the trial by his opinion formed in advance ; that, if he should leave that moment he would still hold his opinion, but if put upon the jury

would discard his opinion and decide upon the testimony; that in the latter event his mind would not be in such a condition that it would require evidence to overcome his opinion; and he could try the case without being influenced by that opinion.

We think this juror, and for the same reason, the other two who were challenged, were competent within the principles we have declared as applicable since the legislation of 1872 and 1873. (*Thomas* v. *The People*, 67 N. Y. 218; *Cox* v. *The People*, 80 id. 500; *Balbo* v. *The People*, id. 484.)

In the first of these cases it was held that impressions or opinions derived from hearing the matter talked about, and which depended upon the truth of what the juror had heard, did not disqualify, where he testified that he would decide the case upon the evidence, unbiased and uninfluenced by his impressions. And in the second case it was said, that where a juror testified that he had formed an opinion from reading the newspapers; that he believed what he there read till it was contradicted; that his opinion was contingent upon the supposed truth of the statements read; but could set aside his opinion and decide upon the evidence; he was competent to sit and the challenge was properly overruled. The decision in the case of *Greenfield* v. *The People*, (74 N. Y. 277) rested upon an entirely different state of facts. There the juror had read the testimony given on a previous trial of the prisoner for the same offense, and on that testimony had formed an opinion. That opinion rested not upon rumor or mere newspaper assertion, but upon a report of the sworn testimony given on the trial. Necessarily, such an opinion was neither hypothetical nor contingent. The very same testimony was likely to be repeated, and the juror would hear it with its result already lodged in his mind. Nothing of that kind was true in the case at bar. The jurors here had read the newspapers and formed the ordinary opinions created by their perusal. The opinions were hypothetical, known to depend upon the truth of what had been read, and left the jurors able to declare that they could discard those opinions and try the issues between the people and the prisoner, impartially and without bias. We

think the court correctly decided that the jurors were competent, and as, therefore, it cannot be said that an erroneous decision compelled the accused to resort to his peremptory challenges, the further question of his right to interpose them anew, although in fact fully exhausted, has no foundation left upon which to rest, and need not be determined.

The appellant complains that he was not allowed to prove the intent of Davidson in making out the bill alleged to be false. The court did not exclude the facts which occurred, or the statement of the witness made at the time to Genet of what his purpose was. His intent as communicated was, perhaps, material, and was therefore admitted. His intent known only to himself could in no manner affect Genet, and no view of the case has been suggested in which it is at all material. Practically, however, the witness was permitted, in stating what occurred, to develop his intention, which was to have Genet collect the bill, so as to be ready to pay for the iron on delivery. The objection, therefore, to the ruling was not well taken.

Upon the cross-examination of Davidson, the defendant's counsel, while seeking to elicit new matter constituting an element of the intended defense, claimed the right to put leading questions, which was denied by the court. The rule in such case was very fully and ably discussed in the opinion of Judge Brady at General Term, and the authorities cited. (*Harrison* v. *Rowan*, 3 Wash. C. C. 580 ; *Ellmaker* v. *Buckley*, 16 Serg. & R. 77; *Phil. & T. R. R. Co.* v. *Stimpson*, 14 Pet. 448; *Castor* v. *Bavington*, 2 Watts & Serg. 505 ; *Floyd* v. *Bovard*, 6 Watts & Serg. 75 ; *Jackson* v. *Son*, 2 Caines, 178; *People* v. *Moore*, 15 Wend. 419.) The conclusion reached, that such right does not exist, meets our approval. A different rule would enable a party to develop his defense untrammelled by the rules which govern a direct examination, and give him an advantage for which we can see no just reason. As to the new matter the witness becomes his own, and in substance and effect the cross-examination ceases. That is properly such only while it is directed to the evidence given

in behalf of the adversary. When it passes beyond that it becomes the direct and affirmative evidence of the party, and should be subjected to the appropriate restraints. There is no reason in the nature of the case, why a direct examination should be guarded against the evil and danger resulting from leading questions which does not apply to an effort upon cross-examination to introduce a new and affirmative defense. We see no error in the ruling of the court in this respect.

Objection is made to the range of cross-examination allowed to the prosecution as it respected the evidence of both Scallon and Genet. In both cases it was searching and severe, and extended over a wide area of subjects and circumstances, and is claimed to have wandered far away from the precise issues involved, and to have seriously and unjustly prejudiced the case of the defendant. Our control over such an alleged error is not absolute. As a general rule the range and extent of such an examination is within the discretion of the trial judge, subject, however, to the limitation that it must relate to matters pertinent to the issue, or to specific facts which tend to discredit the witness or impeach his moral character. (*The People* v. *Brown*, 72 N. Y. 571; *Ryan* v. *The People*, 79 id. 594; *The People* v. *Crapo*, 76 id. 290.) If this limitation is not disregarded we can only interfere where there has been an abuse of discretion. (*Great Western Turnpike Co.* v. *Loomis*, 32 N. Y. 127; *LaBeau* v. *The People*, 34 id. 230; *People* v. *Casey*, 72 id. 393.) Our only inquiry, therefore, in the present case is, whether the cross-examinations, especially of Genet, went beyond the prescribed limit, or if not were pushed so far as to amount to an abuse of discretion. The question was raised by a general objection permitted to be made in advance to every question put on the cross-examination. We cannot encourage that mode of objection. We can only treat it in the same broad and general way, which characterizes the manner of the objection. Very much of the cross-examinations both of Scallon and Genet sprang naturally out of the real issues in the case, and especially out of the defense interposed. Genet claimed that after collecting the amount of the false

bill he offered it to Davidson, who declined to receive it, and then gave it to Scallon, telling him that he must get the iron elsewhere, and the latter testified that he did expend the money for the benefit of the city. In answer to all this the cross-examination aimed to show the falsity of the defense, and for that purpose the relations of Scallon and Genet, the payments of money to the former, the concurrent erection of Genet's house and the alleged use by Scallon of the city's black walnut in Genet's stable, the statements and explanations made by the latter elsewhere, all became the natural and proper subjects of inquiry. So far as Genet was concerned his relation to the commissioners and influence over them was an important element in the case of the prosecution, and hence his large receipt and disbursement of court-house moneys without apparent authority, the large salary paid him for merely nominal services, the appointment of relatives to positions under the commissioners through his influence and recommendation, and the like class of facts tended to show who it was that could procure the indorsement of a false bill, and who it was that sent it on its mission. These two classes of facts, pertinent to the real issues on trial, cover the main and principal range of the cross-examinations. Others, but much fewer in number, tended to discredit or contradict the witnesses. Looking the cross-examinations all over, considering the peculiar and somewhat novel character of the case, we cannot say that the limit of subject or of just discretion was exceeded, or that any wrong was done to the accused. A party who seeks to testify in his own behalf must take the risk if there are vulnerable joints in his harness.

Some other objections were raised which we have examined but do not deem it necessary to further discuss. We discover no error in the proceedings, and the conviction must be affirmed.

All concur.

Order and conviction affirmed.