## Finney and Turpin v. Commonwealth.

(Decided February 18, 1921.)

## Appeal from Madison Circuit Court.

1. Criminal Law—New Trial—Instructions.—Excepting errors committed in the rejection or admission of evidence to which proper exceptions have been taken, as shown by the bill of exceptions, complaining party must include in its motion for a new trial any errors committed during the progress of the trial upon which it intends to rely in this court, otherwise they cannot be considered on appeal, and except in the matter of instructions this court can not consider errors that appear for the first time in the motion for a new trial.

2. False Pretenses—Indictment and Information—Obtaining Money Under False Pretenses.—An indictment which charges that the prosecuting witness has been induced to part with money because of false representations made to her by accused about the pendency of a secret lawsuit and that relying upon said representations as true she paid said money to accused is good on demurrer.

3. False Pretenses—Obtaining Money Under False Pretenses.—The test under Ky. Stats., sec 1208, as to obtaining money by false pretenses is not limited to the inquiry of whether the means employed by accused must be calculated to deceive persons of ordinary prudence and discretion since the protection of the statute was intended as well for the credulous, the careless, the ignorant and the helpless.

4. False Pretenses—Obtaining Money Under False Pretenses.—Whether the false representations are such as are calculated to deceive one of the capacity and understanding, and in the situation of the prosecuting witness, is a question of fact to be found by the jury.

5. False Pretenses—Obtaining Money Under False Pretenses.—Where the evidence shows that one of the accused, with the knowledge and concurrence of the other, makes the false representations charged, the conviction of both is warranted.

JOHN NOLAND, R. C. OLDHAM and A. FLOYD BYRD for appellants.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Affirming.

Appellants, Lizzie Finney and Florence Turpin, were indicted on the charge of obtaining money by false pretenses and upon trial were found guilty and sentenced respectively to terms of five and three years in the penitentiary. Complaining of this judgment they have appealed.

Though several grounds are urged for reversal, we can notice only those contained in the motion for a new trial. It is provided in section 254 of the Criminal Code that "the grounds upon which a motion for new trial is made must be stated in writing and filed at the time of the making of the motion," and it seems to be well settled in this state that, excepting errors committed in the admission or rejection of evidence, to which proper objection and exception have been taken and shown by the bill of exceptions, it is necessary for the complaining party to include in the motion for new trial all errors committed during the progress of the trial upon which it is intended to rely in this court, otherwise they can not be considered on appeal; nor will this court, except in the matter of instructions, consider errors that appear for the first time in a motion for a new trial. Thompson v. Commonwealth, 122 Ky. 501, 91 S. W. 708.

One of the grounds for a new trial is the alleged admission of incompetent evidence and the rejection of competent evidence. Few objections to the testimony were made during the trial and in no instance do we find the ruling of the court prejudicial to appellants. We will consider, therefore, only the two remaining grounds appearing in the motion for a new trial.

In the first place it is said the court erred in overruling the demurrer to the indictment. The indictment alleged that appellants made certain statements to the prosecuting witness relating to the pendency of a secret lawsuit against her and if she, the prosecutrix, did not turn over to the appellant, Lizzie Finney, the sum of $15,316.-70, everything belonging to the complaining witness would be taken from her and her reputation ruined and that "relying upon said representations as true she did turn over to Lizzie Finney the sum of fifteen thousand three hundred and sixteen and 70-100 dollars." As grounds for the demurrer it is said the indictment is defective in that it does not state the complaining party believed the truth of the statements made, and that relying thereon she was induced to part with her property. Bryant v. Commonwealth, 104 Ky. 593, 47 S. W. 578, is cited in support of this contention. The indictment in that case did not allege the complaining witness either believed in or relied upon the representations alleged to have been made, and for this reason the indictment was held to be fatally defective.

In Smith v. Commonwealth, 141 Ky. 534, 133 S. W. 228, the indictment attacked as being defective contains this language:

"And relying upon said statements as true and believing in the truth of same the said Thompson advanced said Smith upon said tobacco $35.00 in lawful money."

It was insisted in that case the indictment was bad because it failed to aver that but for the representations mentioned the prosecuting witness would not have advanced the money. .In holding the indictment sufficient the court said it is not a matter of first importance what particular words are used to show that the person defrauded relied upon the truth of the false statements and was thereby induced to part with his money. Any words expressing the idea, or from which it can be clearly inferred, will be sufficent. The purpose of an indictment is to inform the complaining party in ordinary language the nature of the charge against him. Referring to the words above quoted the court says:

"This was in substance saying that Thompson was induced by the statements, which he believed to be true, to advance the money, and in effect a charge that he would not have advanced it except for the fact that the statements were made and he believed them. The accused, assuming that he had ordinary intelligence, could not fail to understand, after reading the indictment, the nature of the charge against him. Nor could the court have any difficulty in pronouncing judgment, as the indictment contains every averment necessary to constitute the offense charged."

To same effect is Rand v. Commonwealth, 176 Ky. 343, 195 S. W. 802. The indictment is not set out in full in the latter opinion, but the court says the indictment alleged that the county representatives from whom appellant fraudulently obtained money by false pretenses, relied upon the false statements made by him and the money paid him was obtained by reason of his false statements and representations. This was held to be a substantial averment that the defrauded party relied upon the false statements and representations and was thereby induced to part with his money. We think these cases ample authority to sustain the position that the statements in the present indictment were sufficient to fully apprise appellants of the charge against them. The words quoted substantially alleged that reliance upon the false statements and representations made by appellants

to the prosecuting witness and her belief in the truth of said statements were what induced her to part with her money. It is further alleged in the indictment that said statements were false and untrue as there was no secret suit pending against the prosecuting witness.

The court did not err, therefore, in overruling the demurrer to the indictment.

The remaining ground to be considered is whether the verdict is contrary to the evidence.

Before entering upon a discussion of this question we will digress long enough to read a few pages from the family history of the actors appearing in the scene soon to be presented. The prosecutng witness, Sarah Finney, is 63 years of age. She resided with her husband in the state of Florida until his death several years ago. He died seized of considerable real estate which was devised to his widow. After her husband's death Sarah Finney moved to Madison county in this state. This couple had an only child, a son, Will Finney, who married the appellant, Lizzie Finney, in 1904. Two children, Paul and Sallie, were born of this marriage. In 1919 their daughter married at the age of sixteen. Appellant, Florence Turpin, is a sister of Lizzie Finney. Will Finney does not appear to have had any fixed employment and depended largely upon his mother for support, not only for himself but for his family. For several years he and his family, as well as Florence Turpin, lived in the home of his mother. Lizzie Finney apparently had charge of the house, attended, in a large degree, to the household duties and paid the running expenses and upkeep of the establishment from money furnished by the mother-in-law. Because of his dissolute habits, Lizzie Finney was compelled to leave her husband, the separation taking place about January, 1920, at which time she went to live with her father in Estill county, and later moved with her son, sister and a brother, to Akron, Ohio.

About the time of the separation Sarah Finney disposed of a portion of her property for the sum of $30,-623.40, which amount was deposited to her credit in a Richmond bank. On January 26, 1920, Sarah Finney gave to Lizzie Finney exactly one-half of this amount, to wit: $15,316.70. Of the sum so received by her, Lizzie Finney paid $10,000.00 as part payment on the purchase price of a $22,000.00 house in Akron, Ohio. But why this payment to Lizzie Finney? The story is a long, weird

one, reminding one of sacrifices to Moloch and of tribute paid to mythical and insatiable gods. This is the story. We will give it in narative form as detailed by the mother-in-law, Sarah Finney:

Lizzie Finey told me we were in a secret lawsuit and she told me to pay her that $15,000.00 and she would settle this lawsuit, and this is the reason I sold the property. She first spoke of the secret law-suit some seven or eight years ago; told me that if I did not do this, or that or the other that Will Gould would sue me; that Will said I had not done right and he did not like me and I was no good; now this man did not know a thing about me and I told her so and she told me, well, Granny, this is what he said. Just kept it up for seven or eight years. She first said Bertha Horn was going to sue her and make me a party because she could not make anything out of Lizzie, but she could out of me; she said if I would give her $1,500.00 that she could settle the case and I promised to do so and I paid her the $1,500.00 and she said she gave it to the lawyer to settle it. But every once in a while she would come back and say she was afraid Bertha would come again with that lawsuit; that she was still making threats and she suggested that I had better go down and have a will written so that it could be held in case Bertha did anything; so I fixed up the will as she suggested. Later she said, "Granny, Bertha is coming with that lawsuit again and it is worse than ever. She and Will Gould have gotten together and they want to get hold of you," and she said she was going to see the circuit judge, and later she came back and said the circuit judge said I would have to keep my "dues" paid up. This I did from time to time. She commenced at $20.00 and finally got up as high as $100.00. These dues were on account of this secret lawsuit she told me, so I paid all along, and she says she talked with another lawyer and he told her the same about keeping these dues paid, and finally she began begging me to sell the farm. Other times she would come in and sit down and cry over it and tell me we were in a terrible shape, we were in a close place and I would try to get the money together for the dues, and then she told me we would have to get a machine so she could attend to the business of this suit, that the circuit judge told her this must be done. I told her I was not ready to get a machine, but she insisted so that I finally purchased one for $1,575.00 and she told me to tell the people that I gave

her this machine, as a present, so that it could not be taken in this secret suit. When she went to Akron she took the machine with her. Again she told me she had seen a lawyer at Frankfort, and he told her to have me sell the farm and divide it just to a copper, so when I received the money from the sale of the place I had the bank figure up exactly one-half ($15,316.70) and I took the check to the hotel where she was and gave it to her. I had seen her the evening before and she asked me about the sale of the property; being unable on account of the late hour to get to the bank she insisted that I give her a memorandum to show the money was there and that one-half of it was coming to her. She told me when I gave her the money she was going to get the circuit judge to help her send it off. When she talked about this secret lawsuit she would drive the others, with the exception of her sister, Florence, out of the house. Florence Turpin was present at all these conferences.

Several months later Lizzie came to me and told me I had to sell another piece of land I had, and that I would have to give her just half of the proceeds to get rid of the lawsuit; that Will Gould was liable to take the land away from me and I had better hurry and sell it. She said the matter had gotten into the government's hands and to keep things straight it would be necessary to have $4,000.00. On or about the 22nd of July I drew $4,000.00 in currency from the bank and gave it to Lizzie; she first read to me a letter which she said was written by a lawyer at Akron, stating that if I would pay the $4,000.00 he would end the lawsuit entirely, and I would not be bothered with it any more. She promised to have the lawyer fix up a receipt and send me but she never did so. She told me not to keep any papers concerning this matter.

In September, my son, in looking over my bank book, found these large withdrawals of money and inquired where I had been investing my money, whereupon, after pledging my son to absolute secrecy I told him what had happened. He assured me there was no lawsuit, secret or otherwise, and at his suggestion I talked to a lawyer about the matter. This lawyer told me I had been swindled out of my money and not to pay Lizzie any more money. Shortly thereafter Lizzie appeared on the scene again and told me a government official and lawyer had been to see her and that it was necessary for her to get $2,000.00 more on this lawsuit. I told her I was not go-

KENTUCKY REPORTS. [Vol. 190.

ing to pay her another cent, and when I refused, after repeated requests and threats, Lizzie jumped out of the machine and shook her fist at me and told me if I did not give her the $2,000.00 she would sue me for every cent I had and put me in the poorhouse. Thus reads this remarkable tale, at least a part of it. We do not think it necessary to give more.

The Bertha Horn referred to is a cousin of Lizzie Finney; Will Gould married a cousin of Sarah Finney and their families were on friendly terms. When asked on cross-examination, why she did not tell her lawyer or someone about the secret lawsuit, Sarah Finney says Lizzie told her that whatever she did not to hint it to the living, that she, Lizzie, would attend to it, and for her to keep quiet and not tell anyone.

Lizzie Finney denies in *toto* the conversation detailed by her mother-in-law, but admits receipt of the check for $15,316.70. She says this money was given to her to rear and educate her two children and buy a home for them, but in making this statement she evidently forgot that when the check was given to her her daughter had married and moved to Fayette county. Instead of a home for her children it became one for her relatives. She says she rather objected to receiving the money, and advised her mother-in-law not to sell the property, but her mother-in-law insisted she was going to sell it and divide the proceeds. She files a number of checks covering several years' disbursements for household expenses. Most of these were given in the year 1917. She says she always had gotten along all right with her mother-in-law; there was no ill-feeling or unpleasantness between them until she filed suit for divorce; this seemed to have made her angry, as shortly thereafter her arrest followed.

Of the $22,000.00 investment in the Akron residence and of the amount and disposition of the proceeds of its sale in September, 1920, little is known. The cross-examination of Lizzie Finney is marked by her extreme reticence. She was unable, or at least did not state with any degree of certainty or definiteness what had become of the proceeds of that sale. She could not remember the address of one with whom she had left a note given as part of the consideration, and this although the sale had taken place approximately just a month before. It is manifest she was not disposed to give all the facts. This

may have been due in a large measure to the fact that a civil suit was pending against her for this $15,316.70.

Commenting upon the evidence of Sarah Finney, counsel characterize it as either the delusions of a disordered mind or the fabrication of a designing party for the accomplishment of some sinister purpose. Furthermore, that the question of the secret lawsuit is so ridiculous and absurd that the statements, if made, were not calculated to deceive a person of ordinary intelligence. That the means employed by the offending party must be calculated to deceive persons of ordinary prudence and discretion is one of the elements of the crime of obtaining money under false pretenses recognized in many jurisdictions, but this doctrine has been modified in this state, in the enunciation of a far more rational and just rule by which the full protection of the statute is given not only to the credulous and careless but especially to the ignorant and helpless. For instance in Commonwealth v. Beckett, 119 Ky. 817, 84 S. W. 758, it is stated:

"It may be said that a false representation or token is not within the statute 'unless calculated to deceive persons of ordinary prudence and discretion. 2 Whar. Crim. Law, 2129; Commonwealth v. Grady, 13 Bush 285, 26 Am. Rep. 192. This is true only in a limited sense, for the statute was not designed to protect only the ordinarily wary and prudent, who, in spite of their vigilance, might be overreached by the clever rogue, but must have been aimed at all scoundreldom, who, by false statements or tokens, succeeded in hoodwinking the unwary, or even the foolish, into parting with their property. The statute has a twofold purpose: (1) To protect the owner of the property against cheats; (2) to punish the cheater. It can not be said that the law is partial to 'persons of ordinary prudence and discretion' in protecting them in their property, whilst it leaves imprudent and silly persons to lawful prey for frauds. On the other hand, in punishing the wrongdoer, his motive and its results are the main subjects of inquiry. Under this statute the wicked purpose—the fraud—is equivalent to the same ingredient in theft. So is the result the same. The distinguishing feature is, in theft the owner does not intentionally part with the title and possession of his property, while under this statute he does. It would not do to say that to steal from a careless or imprudent person is not punishable, though the statutes against larceny aim to

protect the owner in the possession of his property, as well as to punish the thief who purloins it. Under the statute being considered the pretense or token must be false. Where a token is used, it must be calculated to deceive, according to 'the capacity of the person to whom it is presented to detect its falsity under the circumstances. A token that might be calculated to deceive a blind man, or one in the dark, or a child, would not necessarily be a false token when used upon one who could see, and who has mature judgment. Peckham v. State (Tex.) Cr. App.) 28 S. W. 532. . . .

''Whether the false token is one calculated to deceive one of the capacity and understanding and in the situation of the prosecuting witness is a question of fact to be found by the jury. Wagoner v. State, 90 Ind. 507. In People v. Oyer and Terminer, 83 N. Y. 436, it is laid down distinctly that the pretense must be calculated to deceive, leaving that to be determined by the jury; and, if the pretense was capable of defrauding, it is sufficient.''

To same effect see Commonwealth v. Watson, 146 Ky. 83, 142 S. W. 200; Gregory's Criminal Law, Sec. 376.

These same considerations must control us here. As jurors the case may not have impressed us. To many it may appear a pure fabrication, so improbable of belief as to be incapable of misleading or deceiving the most unsophisticated. And yet every day, confidence men, so-called, are extorting money through schemes and guises so old and simple it seems improbable that anyone could or would be ensnared by their artifices though among their victims are oftentimes found persons of more than ordinary intelligence.

We can not, under the circumstances, say the verdict is flagrantly against the evidence. There is a contrariety of testimony. The issue was for the jury. They saw the witnesses and having found appellants guilty we find no ground to reverse their judgment, nor do we find any merit in the contention that the evidence does not support the charges in the indictment.

Florence Turpin was present, encouraging and corroborating the statements of her sister and assisted her in inducing Sarah Finney to part with her money. Under such circumstances, where the evidence shows that one of the defendants with the knowledge and concurrence of the other makes the false representations charged, the conviction of both is warranted.

While perhaps unnecessary, we might add that the circuit judge and the attorneys mentioned in the evidence are not shown to have had the least knowledge of or connection with any of the remarkable statements attributed to them.

The judgment is accordingly affirmed.