## Court of Appeals—New York.

### April 18, 1899.

## PEOPLE v. ADRIAN BRAUN.

1. CRIMINAL LAW—COURT OF APPEALS.

On the review of a conviction of murder in the first degree, where the defense of insanity is interposed, the verdict is conclusive upon that issue, in the absence of such elements from the case as show that the verdict was against the weight of evidence, or that it was influenced by some mistake, error or prejudice.

2. SAME—CROSS-EXAMINATION.

A cross-examination is within the discretion of the trial judge, and each case rests largely upon its own facts.

3. SAME—DISPARAGING QUESTIONS.

The court in its discretion may exclude disparaging questions put to a witness on the cross-examination not relevant to the issue, though avowedly for the purpose of discrediting him, even if no claim or privilege be interposed; and such ruling is not reviewable on error unless the discretion be manifestly abused.

4. SAME—IRRELEVANT TOPICS.

Inquiries on irrelevant topics to discredit the witness, and to what extent a course of irrelevant inquiry may be pursued, are matters com-

mitted to the sound discretion of the trial court. The exercise of this discretion is not the subject of review except in case of plain abuse and injustice.

APPEAL from judgment for conviction of murder in the first degree.

Adrian Braun was convicted of murder in the first degree, and he appeals.

Affirmed.

John F. Brennan for appellant.

Geo. C. Andrews, District Attorney, for the People.

BARTLETT, J.—Adrian Braun, the defendant, was committed to Sing Sing prison in September, 1897, to serve a term of two years for assault in the second degree, upon the complaint of one John Carroll. It appears that the defendant, at his residence, in the city of New York, was engaged in a quarrel with his wife, when certain men rushed in, and the assault for which he was convicted took place at that time upon two of the persons who thus appeared upon the scene. The record is very vague as to the details of this transaction. Between the time of defendant's removal to Sing Sing prison and the homicide, on the 5th day of March, 1898, his wife had paid him two or three visits. On each of those occasions she brought him luxuries, and the interviews, always held in the presence of prison officials, seemed to have been ordinarily pleasant and cordial. On the day the wife was killed she reached the prison about a quarter past three in the afternoon, it being Saturday. On this occasion she brought two cans of milk, a pair of socks, and some matches for the defendant. Agreeably to her request, her husband was sent for, and she met him in " Jackson's Room," so called, which was the office of the state detective connected with the prison, and the place where interviews were held between convicts and their visiting friends. Jackson or his representative was always present, and two or three convicts engaged in and about the place were where they could observe all that was going on. On this occasion Jackson was at his

desk in the room where the interview was held, and three con-
victs were stationed where they could command a view of the
scene.    The defendant reached the room about twenty minutes
after three, and, as appears, greeted his wife affectionately by
shaking hands and. kissing her.    They then seated themselves
on a bench which ran around the walls of the room, and upon
which the seats were separated by iron arms similar to those in
the ordinary railroad depot waiting room.    They occupied ad-
joining seats, the wife sitting on the left of the defendant.    The
four witnesses referred to agree that the conversation was carried
on in a low tone ; there was no evidence of excitement or anger ;
nothing to indicate a quarrel ; and it was treated by all, during
its progress, as the merest commonplace, such as is usual when
visitors were present.    At ten minutes to four Jackson called
to them, stating that the prison building was closed on Saturday
to visitors at four o'clock, and that he could not give them any
more time.    The defendant pleaded earnestly for more time,
having arisen and approached the desk, and wife also came
forward from her seat and joined in the request.    Thereupon
Jackson said he would give them the remaining ten minutes,
until four o'clock, and they resumed their seats.    Jackson testified
that in about a minute and a half after this he heard something
like a scuffle, and looking around, discovered that they had
risen to their feet, and the defendant had his left arm around
the waist of his wife, having drawn her up to him, and was
plunging a knife that he held in his right hand into the left side
of her neck; that he rushed over, and "grabbed" defendant
by the arm, and pulled him away from his wife; and the ser-
geant of the guard, or some other officer who had been called,
came in and took the defendant by the other arm.    Without
going into further details, the witnesses testified that the wife
staggered forward two or three steps, sank to her knees, then
fell over upon her back, the blood spurting in large quantities
from her neck, mouth, and nostrils.    The prison doctor was
summoned, reached there almost immediately, and stated that
she could not live to exceed a minute.    She died almost im-
mediately, and the witnesses agree that from the time of the
assault to her death was somewhat from three to five minutes.

It is to be remarked that the defendant, from that time until the day of his trial, persistently refused to state what motive actuated him to committing this terrible act. The defense did not deny the killing, but sought to establish the insanity of the defendant.

The people proved, in detail, the circumstances of the killing, and also established, by a convict named Schwab, who worked by the side of the defendant in the room where potatoes were peeled for prison use, that the latter had made to him repeated threats against his wife. He testified that he was committed to the prison on the 7th of October, 1897, and was at once assigned to work in the potato peeling department alongside of the defendant; that after he had been there two or three days the defendant grew somewhat confidential, and, in talking about how he came to be in prison, stated that " he would get square with his wife for sending him to prison; that some day she would come up, and she would not go down again." The witness swears to another conversation on the same subject the next month, November. He testified as follows: " One day my knife was quite dull, and I asked Braun would he sharpen it for me, and at the same time I asked him to loan me his, which he did. He handed me his knife, and started to sharpen mine, and when he returned mine I said, ' Braun, your knife is quite sharp; too sharp to peel potatoes with;' and he said, ' I don't want it to peel potatoes with, for I will do something else with it.' I said, ' What are you going to do with it?' He said, ' I will stick it into that God damned bitch of mine some time when she comes up here.'" This witness further swore that at the next interview, some weeks later, the defendant said to him, after his wife had departed, ' What do you think she brought me up?' I says, ' How do I know?' And he said, ' She brought me a couple of cans of milk, a pair of socks, and two boxes of matches.' I said, ' I think that is more than you ought to expect from a woman who goes out washing, as you say she does.' He says, ' I will get square with her some time. She won't have to spend many more sixty cents on me to come up to see me.'" This witness further testified that some little time after this third conversation he (the witness) received a

package that contained a small Roman Catholic prayer book entitled " Child of Mary " ; that he showed it to the defendant, who borrowed it of him, and after two or three days returned it. Later the witness, on examining the book, found that the defendant had marked a certain portion of it, and asked him why he did so, and he replied that he did not believe the passage which was marked. The portions of the book marked were certain questions under the heading of the fifth commandment, " Thou shall not kill." These questions were designed to probe the conscience of the reader as to whether he had been guilty of anger, violent passion, or had indulged in revenge, or desired the death of another. The defendant did not take the stand on his own behalf at the trial, and this testimony of Schwab went to the jury uncontradicted, save as its full force and effect might have been somewhat broken by the fact that it was given by a convict serving his term in state prison. In this connection, it is to be observed that no possible motive was disclosed to induce Schwab to swear away the life of the defendant. So far as we are able to judge, it was testimony given under legal compulsion, and by a man who did not know defendant until he met him in state prison.

There is one slight piece of evidence bearing on the mental condition of the defendant sworn to by the first witness who took the stand. The district attorney moved to strike it out, but the trial judge allowed it to remain. Bernard Shaffer, a witness for the people, swore that he was a resident of the city of New York; knew the Brauns; and that in the month of July, 1897, prior to the defendant's conviction for assault, he called at their house, as representing some charitable society of which defendant had asked assistance, and he questioned Mrs. Braun as to how it came they were in such poor circumstances, " and she told me that her husband was out of work, and that he lost all his jobs by his not being right in his head." The defense swore a witness, John Mielich, who had known the defendant for thirteen or fourteen years prior to the homicide, but had lost sight of him for a long time, until about two or three years before that event. He testified that he had seen the defendant on a number of occasions, and that his face would flush

suddenly, and that he seemed to be shivering, and always muttering to himself. Another witness, Mary Schmechenbecker, the wife of defendant's uncle, testified that when she first knew the defendant, in early life, he was "jolly, full of life; always in for a good time"; but, during the last two years before the homicide, a great change had taken place. The defendant was in the habit of visiting the house of witness at intervals during the last two years of his life before going to state prison. She testified, generally, to his strange actions on several occasions, and, referring to a certain time, she stated: "That day, when he came to my house, he looked like a man who was able to kill anybody. I looked around, and was deadly afraid of him. He looked very ragged, and never like the man that he did before. He had no hair combed. He had his shirt sleeve open and unbuttoned, and he looked wild, and I was deadly afraid of him." She further stated that his eyes were wild looking, and rolled in his head, and she did not like his looks. Martin Schmechenbecker, the husband of the last witness, testified that the defendant's mother was his sister, and that when she was between forty and fifty years of age she was committed to an insane asylum, and there detained for nearly a year, when she received her discharge, and lived about eight years after her return to the family. The defense then swore Dr. Lawrence J. Morton, an expert on mental and nervous diseases, who testified to having seen the defendant after the homicide on two occasions, and stated the details of his interviews. He was then asked his opinion, based upon those examinations, as to the mental condition of the defendant, and stated that he believed him to be suffering from the delusion of persecution and suspicion; that the technical name for this form of insanity is "paranola," which was later explained as being the synonym of "monomania." A second expert was sworn, Dr. Philip A. Brennan, who testified that he had examined the defendant on two occasions as to his mental condition, and discovered that he was a paranoyic, suffering from a delusion of persecution and suspicion, and that he was morose and melancholy. On being further questioned, he said that he believed the defendant insane. It should also be stated that both of these experts for the defense

testified that the transmission of insanity from the mother to the children frequently occurs. This covers, substantially, the case for the defense.

In rebuttal the people recalled to the stand Dr. Irvine, prison physician, who testified to having seen the defendant on several occasions after the homicide, and that he thought his acts, con-duct, and conversation at all times were rational. The next witness sworn by the people was Dr. Collis F. McDonald, an expert, who was at one time the president of the state commis-sion of lunacy. He testified that he had two interviews with the defendant since the homicide, at the suggestion of the district attorney. The first interview lasted an hour and a quarter. The doctor swears that he was very frank with the defendant. Told him who he was, and how he came to call upon him, and stated that he was there to make a truthful report, and should do so, whether it was against the state or the defendant. The defendant, in the course of a long conversation, told the doctor that he had been convicted of assaulting two men, one of whom was named Carroll. He said he did not know the name of the other one. He also told him that his wife had visited him three times while he was in prision, and that she wrote him that she had to go out washing for a living and take in washing in the house; that she had three of her children with her and two of them were in an orphan asylum ; that he had lived pleasantly with his wife; that at times they had quarrels, like other married people. He referred to his mother's mental condition, how it manifested itself, and said she was excited and talked out of her mind. The doctor testified: "I asked him as to the reason for killing his wife,—if he had any reason for doing such a deed. He refused to answer it,—to tell what reason he had." He further said that he could not say he had killed her, as he had not seen her dead. He had heard that she was dead. The doctor further stated that, after the defendant's repeated refusals to give him any reason for committing the murder, he told him he knew the reason, and imparted it to him; that he neither ad-mitted nor denied it, but said, in reply to this, that suspicion of such a thing was not proof of its existence, and he had no proof that his wife was unfaithful to him. The inference was that he

had suspicion, but no proof. The doctor finally testified, based upon his examinations, that he had found the defendant sane; that he saw no evidence of insanity,—nothing that would indicate it. He further stated that he had never known of a recovery from genuine paranola. The suggestion that the defendant had any reason to consider his wife as unfaithful to her marriage vows is quite as vague as the charge that she had anything to do with securing his conviction upon the indictment for assault. The next witness for the people was Dr. Samuel B. Lyon. He swore to having examined the defendant as to his mental condition at the request of the district attorney. It appears that this witness was as unsuccessful as Dr. McDonald in eliciting from the defendant any statement as to the motive for killing his wife. He even refused to answer the question whether his wife was a good woman. This witness testified that there was no suggestion of insanity arising from his examination, and that his only reason for supposing the defendant insane was the fact that the crime he had committed was so inexplicable that he felt the motive might be disclosed by his examination. The last witness sworn by the people was Dr. Edward C. Spitzka, a well-known expert, who testified to having examined the defendant, at the request of the district attorney, and had found him perfectly sane.

On the review of a conviction of murder in the first degree, where the defense of insanity is interposed, the verdict is conclusive upon that issue, in the absence of such elements from the case as show that the verdict was against the weight of evidence, or that it was influenced by some mistake, error, or prejudice. People v. Hoch, 150 N. Y. 291, 44 N. E. 976. The question of the defendant's sanity seems to have been fairly submitted to the jury in the case at bar.

The counsel for the appellant does not seriously criticise the charge of the court, but insists that there was reversible error in the refusal of the trial judge to allow certain questions to be answered that were addressed to the people's witness Schwab on his cross-examination. Rulings were made upon a number of questions, but they can all be treated together, as they come under substantially the same objection and exception. The

following extract from the record presents this exception fairly : "Q. Where do your folks live ?   A. I refuse to answer where my folks live.   My mother does not know where I am, and she has not known where I am.   She has not known since I have been in prison, and I do not propose to let her know, and break her heart, that I am in jail."   The court instructed the witness to answer, and he stated Philadelphia.   He was then asked this question :   " Whereabouts in Philadelphia ?"   The witness refused to answer this question, and, after a long colloquy between counsel, the court said :   " I will reserve this question until to-morrow morning."   At the opening of court next morning the following questions were put to the witness by the court:   "Is the name which you are imprisoned under your real name ?   A. Yes, sir.   Q. That is your real name, — the name under which you were known before your imprisonment ? A. Yes, sir.   Q. You have a right to say to the court the ground on which you refuse or decline to make your statement, but not any fact connected with the case.   A. This is no fact about the case.   The Court : You have a right to state to the court your reason for declining.   The Prisoner's Counsel :   I object, unless the statement is that it tends to discredit or disgrace him, those being the only grounds permitted in law for refusing to answer a question, and I object to any other statement being made.   The Court: You have heard what the counsel has said.   I think that is a fair statement.   Do you put it on that ground ?   The Witness : Yes, sir.   The Court : The court did not intend to suggest that, and should not have suggested it, but it came from counsel."   The prisoner's counsel then asked the witness these questions :   " Q. Do you decline to answer the question put to you yesterday ?   A. On those grounds, yes.   Q. You say it would tend to discredit you and disgrace you, to tell where you live in Philadelphia?   A. You did not ask me where I lived ; you wanted to know my mother's address.   Q. Would that tend to disgrace you ?   A. It would tend to disgrace my mother to know that I am here.   Q. No; I am not asking you that.   Does it tend to disgrace you, to give your mother's address in Philadelphia ?   A. Is this a reflection on my mother, or what ?   Q. Not a reflection on any-

body; I am asking you a question. A. Yes, sir; it will dis-
grace me, for my folks to know I am here. Q. What is your
mother's name? A. I positively refuse to answer any ques-
tions as to my mother's name. If you wish to know anything
as to who I am and what I am, I will refer you to good people
there; city officials." · The prisoner's counsel then called for
the ruling of the court. The court, after a lengthy statement
and discussing its discretionary power in the premises, said:
" I think I shall sustain the witness in his declination, and give
you an exception." The prisoner's counsel then asked the
name of the witness' father and of his mother, and the witness re-
fused to answer, and was sustained by the court, and an excep-
tion was duly taken. Later on the witness declined to give the
the name of the business house for which he acted as a traveling
salesman just prior to his imprisonment. When pressed for a
reason why he refused to answer, he said : " Because, when I
leave state prison, I expect to go into business again with those
people, and other people, who don't know that I am here to-
day. It will be the means of preventing me getting a situation.
I expect to live this thing down. It is the first time I have
been in prison, and I do not want any more notoriety than I can
help." The witness answered as to his past life and his age ;
where he was born ; whether his father and mother were living ;
whether he was married or single; when married; that he and
his family lived in Philadelphia originally, and afterwards re-
moved to Newark, N. J.; when he was convicted, and for what
offense; in what court he was tried in the city of New York;
the name of his counsel; the names of the alleged drawers of
the two small checks that he had forged, and the fact that he.
was a traveling salesman by occupation; that this was his first
offense, and that he had never been arrested before. This gives
a general idea of the cross-examination of this witness as to the
point under consideration. The scope of it was within the dis-
cretion of the trial judge, and each case rests largely upon its
own facts. If the witness had been the defendant swearing in
his own behalf, it is quite likely that the trial judge would have
allowed the cross-examination to have taken a much wider
range than in the case of a third party. It is a well-settled rule

that the court, in its discretion, may exclude disparaging questions put to a witness on the cross-examination not relevant to the issue, though avowedly for the purpose of discrediting him, even if no claim of privilege be interposed; and such ruling is not reviewable on error, unless the discretion be manifestly abused. La Beau v. People, 34 N. Y. 230; People v Casey, 72 N. Y. 303; Real v. People, 42 N. Y. 280, 281; People v. Court of Oyer and Terminer, 83 N. Y. 460. In the case before us the record does not disclose any abuse of discretion on the part of the trial judge in limiting the cross-examination of this witness in regard to collateral issues. Inquiries on irrelevant topics to discredit the witness, and to what extent a course of irrelevant inquiry may be pursued, are matters in this state and in England committed to the sound discretion of the trial court. The exercise of this discretion is not the subject of review, except in case of plain abuse and injustice. President, etc., v. Loomis, 32 N. Y. 127; La Beau v. People, 34 N. Y. 230. We have examined the other exceptions in the case, but find no reversible error. The judgment appealed from must be affirmed.

All concur.

Judgment of conviction affirmed.