## YANCEY v. MAESTRI.*
### No. 14593.

Court of Appeal of Louisiana. Orleans.
April 23, 1934.

* Stanley McDermott and John C. Moulin, both of New Orleans, for appellant.

Albert B. Koorie, of New Orleans, for appellee.

HIGGINS, Judge.

This appeal presents, for the first time in this state, the question of whether or not an uninterdicted insane person, who, without cause or provocation, shoots and seriously wounds an innocent person, can be held liable for damages in tort under the provisions of the Civil Code of Louisiana. The trial court sustained an exception of no cause of action and dismissed the suit. Plaintiff has appealed.

The issue presented involves an interpretation of article 3521 (formerly 2294) of the Revised Civil Code, upon which the plaintiff predicates her case, reading as follows:

"Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it. * * *"

Plaintiff contends, first, that the language of the article above quoted is all-embracing in its scope, and by no fair, reasonable, and logical interpretation thereof can an exemption from liability in favor of insane persons for their tortious acts be read into the article; secondly, that article 2531 of the Civil Code of 1825 repealed the Spanish, Roman, and French laws which were in force when Louisiana was ceded to the United States (and upon which defendant relies to show that under the civil law there was no cause of action against an insane person for his torts), the acts of the Legislative Council, the acts of the Legislature of the territory of Orleans, and the acts of the Legislature of the state of Louisiana, in every case where provision was made therefor in the Code, and that these repealed laws were made absolutely ineffective because it was provided in the article "that they shall not be invoked as laws, even under the pretense that their provisions are not contrary or repugnant to those of this Code"; that in order to finally eliminate any possibility of misunderstanding with respect to the old laws, the Legislature of 1828 adopted Act No. 83 of 1828, § 25 of which provided "that all the civil laws which were in force before the promulgation of the Civil Code lately promulgated, be and are hereby abrogated"; and that, consequently, our courts are not controlled, in interpreting article 2315 of the present Code, by the civil law of Rome, Spain, and France with reference to torts; thirdly, that almost the entire body of the tort law of Louisiana has been developed under the guidance of the common law and is rooted therein, as is evidenced by the fact that the courts of this state have repeatedly cited decisions of the Supreme Courts of other states of the Union, as well as of the United States Supreme Court dealing with this particular branch of the law; and that as, under the common law, an insane person is liable for his torts, we should adopt the common-law rule rather than the civil law view, in construing the provisions of article 2315; citing R. C. C. arts. 2315–2320; Handy v. Parkison, 10 La. 92; Miller v. Holstein, 16 La. 404; Williams v. Palace Car Co., 40 La. Ann. 420, 4 So. 85, 8 Am. St. Rep. 538; Buechner v. City, 112 La. 602, 36 So. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455; Weaver v. Goulden Logging Co., 116 La. 468, 40 So. 796; Act No. 83 of the Legislature of the state of Louisiana of 1828, § 25; Henry P. Dart on "Influence of the Ancient Laws of Spain on the Jurisprudence of Louisiana" (American Bar Assoc. Journal, February, 1932, also published in 6 Tulane Law Review, p. 83); Law of Insanity by Smoot, chapter 13, page 361; Ruling Case Law, vol. 14, p. 596; Corpus Juris, vol. 32, §

545, p. 749; Chapin on Torts, p. 162; Cooley on Torts, vol. 1, p. 187.

The curator ad hoc for the defendant based his legal position on the theory that, under the civil law as applied in Louisiana, an insane person is not liable for his tortious acts because, under the Roman, Spanish, and French jurisprudence, and in a number of countries where the principles of civil law are recognized, such injury falls within the category of damnum absque injuria, and that, while the language of article 2315, R. C. C., may appear to be all-embracing in its scope, it is nevertheless an adoption of the concept founded upon the old Spanish laws as applied in Louisiana prior to the adoption of the Code of 1825; that the language of the article had acquired a definite and established meaning which recognized an exception or exemption from liability in favor of insane persons, and, therefore, the provisions of the article should receive an interpretation and construction consistent with the theory of law which prevailed in Louisiana at the time of its adoption and which would cause it to be harmonized with the general theory of the civil law as recognized in the countries where its principles control.

At the outset we may state that it is conceded that under the common law an insane person's estate is liable in damages for his torts. Parke v. Dennard, 218 Ala. 209, 118 So. 396; Campbell v. Bradbury, 179 Cal. 364, 176 P. 685; Central of Ga. R. Co. v. Hall, 124 Ga. 322, 52 S. E. 679, 4 L. R. A. (N. S.) 898, 110 Am. St. Rep. 170, 4 Ann. Cas. 128; Behrens v. McKenzie, 23 Iowa, 333, 92 Am. Dec. 428; Tucker v. Hyatt, 151 Ind. 332, 51 N. E. 469, 44 L. R. A. 129; McIntyre v. Sholty, 121 Ill. 660, 13 N. E. 239, 2 Am. St. Rep. 140; Seals v. Snow, 123 Kan. 88, 254 P. 348, 51 A. L. R. 829; Young v. Young, 141 Ky. 76, 132 S. W. 155; Feld v. Borodofski, 87 Miss. 727, 40 So. 816; Gibson v. Pollock, 179 Mo. App. 188, 166 S. W. 874; Morain v. Devlin, 132 Mass. 87, 42 Am. Rep. 423; Cross v. Kent, 32 Md. 581; Jewell v. Colby, 66 N. H. 399, 24 A. 902; Williams v. Hays, 143 N. Y. 442, 38 N. E. 449, 26 L. R. A. 153, 42 Am. St. Rep. 743; Moore v. Horne, 153 N. C. 413, 69 S. E. 409, 410, 138 Am. St. Rep. 675, 21 Ann. Cas. 1350; Ward v. Conatser, 63 Tenn. (4 Baxt.) 64; Morse v. Crawford, 17 Vt. 499, 44 Am. Dec. 349; Kusah v. McCorkle, 100 Wash. 318, 170 P. 1023, L. R. A. 1918C, 1158.

In the case of Moulin v. Monteleone, 165 La. 170, 178, 115 So. 447, 451, decided in 1927, plaintiff sued to recover damages from defendant for alienating his wife's affections and companionship. The Supreme Court sustained the exception of no cause of action and dismissed plaintiff's suit. The reasons of the court are so cogent to the issue here presented that we quote copiously therefrom:

"It is argued for the appellant that he has a right of action under the broad statement in article 2315 of the Civil Code that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. It is well settled, however, that that broad language, which first appeared as article 16 of title 4, Book 3, of the Act of March 31, 1808, called the 'Digest of the Civil Laws in Force in the Territory,' and sometimes called the Civil Code of 1808, was only declaratory of a very general and fundamental principle of justice, and was not intended to give a cause or right of action for every grievance, or where none was allowed otherwise under the laws in force in the territory. The same principle which was declared in article 16 of title 4 of Book 3 of the Digest of 1808 had been stated as law 6 in the fifteenth title of the seventh Partidas, viz. 'That he who causes damage to another, by his fault, is bound to make reparation therefor,' and it was a part of the Roman law. But, under those laws, which were in force when the Digest of 1808 was adopted, there was no right of action for damages for the loss of the services or support or companionship or affections of a free person caused by the wrongful act of another. It is certain that, under the Roman and Spanish laws, there was no right of action for alienation of a wife's affections. If a man attempted to seduce or corrupt the morals of a woman, either married or single, he was answerable in damages for the offense to her, but to no one else, no matter how the offense might have injured also her 'father, husband, father-in-law, or other relations.' It was virtually so stated in the seventh Partida, tit. IX, law 5 (Moreau & Carleton's Edition) vol. II, p. 1176, viz.:

" 'Men sometimes offend, dishonour and harass, by various means, married or unmarried women, or widows who lead virtuous lives at home and enjoy good characters, by endeavoring frequently to speak with them, either in the houses where they dwell, or by following them in the streets, churches or other places where they are to be found; or by secretly sending jewels to them and those with whom they live, in order to corrupt them both; at other times by endeavoring to corrupt them, by means of pimps, and in various other ways, so that by great importunity and artifice, there are some women who are finally seduced. And even good women who resist

their attempts are, in a manner, injured in their character, inasmuch as they will be suspected of committing some evil with those who pursue them so assiduously, in either of the ways above mentioned. Wherefore we consider that they who conduct themselves in this manner do great wrong, and injury to such women, as well as their fathers, husbands, fathers-in-law, and other relations. We therefore ordain that every man who shall offend in either of the ways herein mentioned *shall make amends to the woman who sustains injury thereby.*' (The italics are ours.)

"In the Digest of 1808, the article (16, of Book 3, tit. 4) which is now article 2315 of the Civil Code was written thus:

" 'Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it, even though the fault be not of the nature of those which expose to the penalties of simple or correctional police.'

"When the article was copied into the Code of 1825 as article 2294, it was abbreviated thus:

" 'Every act whatever of man, that causes damage to another, obliges him, by whose fault it happened, to repair it.'

"That is an exact translation of article 1382 of the Code Napoleon.

"The first case in which damages were claimed, under article 2294 of the Code of 1825 (now article 2315 of the Revised Civil Code), for the loss of the support and companionship and affection of a person, caused by the wrongful act of another, was that of the widow Hubgh v. New Orleans & Carrollton R. Co., 6 La. Ann. 495, in 1851. The widow, for herself and for her minor children, claimed damages for the loss of the support and companionship and affection of her husband— her children's father—who was killed through the alleged negligence of the defendant. She did not claim that a right of action for the personal injuries which her husband had suffered had survived in her favor or in favor of her children. There was therefore no issue or question of survival or heritability of a right of action for personal injuries. The only question was whether the plaintiff had a right of action for damages against the party whose fault had caused her and her children the loss of the support and companionship and affection of her husband. The court ruled that she had no right of action because, although the case was within the very letter of the law, it was not within its meaning or its spirit. The court observed that article 2294 of the Code of 1825 was not new legisla-

tion, even in the Digest of 1808, but was merely a restatement of a fundamental principle which was theretofore embodied in the laws of Rome and Spain, and that it was therefore subject to the same construction and limitations which had been put upon it in the jurisprudence of Rome and Spain. The court said:

" 'The dispositions of article 2294, are found in the Roman and Spanish laws; so far from being new legislation, that article embodies a general principle as old as the science of jurisprudence itself, and it must still be understood, with the limitations affixed to it by the jurisprudence of Rome and Spain.'

"In an application for rehearing, in the Hubgh Case, it was argued at length and with great force, on behalf of the plaintiff, that, inasmuch as the French commentators and the Court of Cassation had maintained that, under the French Code, there was a right of action for the loss of the services, support, companionship and affections of a person, by the fault of another, this court should give the same construction to article 2294 of the Code of 1825. But the court, through Chief Justice Eustis, replied that the interpretation which the French commentators and the Court of Cassation had given to article 1382 of the French Code was according to the jurisprudence prevailing in France when the article was adopted; whereas, under the jurisprudence of Rome and Spain, which was controlling in Louisiana when the article was adopted in the Digest of 1808, there was no right of action for the loss, by the wrongful act of another, of the services or support or companionship of a free person. The court therefore refused a rehearing, saying:

" 'It is understood that the present action is founded upon the direct injury to themselves by the death of Hubgh, from the causes alleged in the petition; and is not attempted to be maintained as a right transmitted to them through the deceased. The right of action is claimed on the ground on which it has been allowed in France; the articles of the Codes of that country and of Louisiana being identical, which provide that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. *Code Napoleon, 1382; L. C. 2294.* * * *

" 'We found no precedent for any such action, though, unfortunately, occasions for its exercise have been but too frequent within our borders; and with the learning and research which has distinguished our bar for nearly half a century, the singular fact remains unexplained, that up to the present

512

suit no such right of action has been asserted. There can have been but one cause for this; and that is, the universal conviction of the bench and the bar that no such action could be maintained. * * *

" 'The obligation resulting from a tort can only be the ground of an action, when the obligation is recognized and ratified by the law; for by far the greater portion of the wrongs to which we are exposed in our artificial condition of society the law does not afford any redress. The redress is of necessity confined to legal rights, for which the law has provided an action or inflicts a punishment. 3 Black. Com. 23, 117; Pothier on Obligations, Nos. 1 and 197.

" 'We now come to consider whether the plaintiff's right of action is authorized by the articles of our Code. The article 2294 of our Code provides that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. The provisions of this article, however general and comprehensive its terms may be, are found more than once recited in terms equally general and comprehensive in the laws of the fifteenth title of the seventh Partida. The article was inserted in the Code of 1809, at a time when the Spanish laws were in force. *It was put and retained to this time in the Code, not for the purpose of making any change in the law, but because it was a principle which was in its proper place in a Code; a principle which would be equally recognized as a necessary conservative element of society, and equally obligatory whether it was formally enacted in a Code or not.* (The italics are ours.) * * *

" 'Conceding it to be true, that the present jurisprudence (in France) is as stated by counsel, and that the decisions of the Court of Cassation, on this article, are correct—a proposition which we have no interest in questioning—does it follow that our decisions ought to be the same on the article in our Code, which is identical? We think not; and for this reason, that the systems to which the articles apply are not similar. * * *

" 'In the case, therefore, under consideration, the law being different in Louisiana from that of France, as the latter is assumed to be, in argument, and the application of the article being to the law of Louisiana, and not to that of France, the import and sense of the article becomes entirely an open question; and the responsibility of determining its application is thrown upon the court without the aid of any authority, and unrestricted by any interpretation. * * *

" 'Finding that no such action was ever instituted in this state, our inquiries were necessarily directed to the examination of the former *jurisprudence of Louisiana,* in order to ascertain whether the action could be based on any *well-recognized principle in the Roman or the Spanish laws.* (The italics are ours.)'

"In speaking of 'the former jurisprudence of Louisiana,' under the 'well-recognized principles in the Roman and Spanish laws,' the learned Chief Justice, of course, did not have reference to any of the statute laws of Rome or Spain, for they were repealed by article 3521 of the Code of 1825, and by section 25 of Act 83 of 1828. The court had already decided, in Reynolds v. Swain, 13 La. 198, that it was only the 'positive, written or statute laws' of Spain, Rome and France that were repealed by article 3521 of the Code of 1825, and the act of 1828, and not 'those principles of law which had been established or settled by the decisions of courts of justice.' In the case last cited, Mr. Justice Martin said:

" 'We, therefore, conclude that the Spanish, Roman, and French civil laws which the Legislature repealed are the positive, written, or statute laws of those nations, and of this State; and only such as were introductory of a new rule, and not those which were merely declaratory—that the Legislature did not intend to abrogate those principles of law which had been established or settled by the decisions of courts of justice.'

"It is certain, therefore, that, under 'those principles of law which had been established or settled by the decisions of the courts of justice' in Louisiana, before the adoption of the Code of 1825, there was no right of action for damages for the loss of a wife's affections through the wrongful attentions of a third party. We are not aware of any principle in the laws of Rome or Spain prevailing here when the Code was adopted that would have sanctioned such a suit. It would have been utterly inconsistent with the doctrine recognized in the Hubgh Case, that there was no right of action for damages for the loss of the companionship or affections of a husband, or wife, or of any other relation, by the fault of a third party."

See, also, La. Digest, vol. II, "Codes," § 7, p. 155.

Under the Roman and Spanish law an insane person or lunatic, or madman, was not responsible for his torts. Louisiana was governed, in part, by Las Siete Partidas during the Spanish régime. After the adoption of the Code of 1808, the Legislature appoint-

ed L. Moreau Lislet and Henry Carleton to make a translation of all of that portion of Las Siete Partidas which had the force of law in Louisiana. In the translation made by these gentlemen, at page 1179, vol. 2, we find the following:

"Every man or woman above the age of ten years and six months is capable of doing wrong or injury to another; for the ancient sages have conceived that after that age, every person ought to have the understanding to know when he injures another, unless he were a madman or lunatic, in which case, he will not be bound to make amends for anything he may say or do, as he is ignorant of what he is doing, while deprived of his reason. * * *" Partida Seventh, title IX, law 8.

In a translation by Samuel Parsons Scott, M. A. of Las Siete Partidas, published in 1931 for the Comparative Law Bureau of the American Bar Association by Commerce Clearing House, Inc., a division of the Corporation Trust Company (New York), is found, at page 1355 (Partida 7th, title IX, law 8), the following:

"Any person, male or female, over the age of ten years and six months can cause wrong or dishonor to another party, because the wise men of the ancients decided that after this age any one has sufficient intelligence to comprehend if he dishonors another, except where he who does so is insane or has lost his mind; for, under the circumstances, he will not be bound to make amends for anything he did or said, for the reason that he does not understand what he is doing so long as his insanity continues. The nearest relatives of persons of this description, and those who have charge of them, should, however, cause them to be watched so that they cannot wrong or dishonor others, as we stated in several laws of this book that they should watch them, and act; and if they do not, they themselves can be sued for the wrongs which such persons commit."

It appears that this principle was taken from the Roman law. Samuel Parsons Scott in his monumental work "The Civil Law" has translated into English the provisions of Corpus Juris Civilis, as well as the commentaries of the various Roman jurisconsults. In volume 1 of this translation, at page 312, we read:

"An insane person, as well as an infant, are legally incapable of malicious intent, and the power to insult, and therefore the action for injuries cannot be brought against them."

The Opinions of Paulus, book V, title IV, "Injuries."

In volume IX, at page 289, we find the translation of "The Digest of Pandects," title IV, "Concerning the Interdict which Prohibits Violence Being Employed Against a Person Placed in Possession." Ulpianus on the Edict, book LXXII, says:

"It is established that neither a minor nor an insane person is liable under the Edict, because they are destitute of will power."

In volume X, at page 308, under title X of the Digest, entitled "Concerning Injuries and Infamous Libels," Ulpianus on the Edict, book LVI, says:

"It is said, by way of reciprocity, that those who can suffer an injury can also commit it. (1) There are, however, some persons who cannot do this, for example, a lunatic, and a minor who is not capable of criminality, since they can suffer injuries but cannot commit them; for as an injury can only take place with the intention of him who commits it, and the result will be that such person, whether they resort to blows, or use insulting language, is not considered to have committed injury."

This principle of the civil law has been carried down to the present time and is found in the Codes of the modern civil law countries.

The German Civil Code (translated by Walter Loewy, 1909), contains the following:

"Art. 827. One, who in a state of unconsciousness or in a state of impairment of the mental faculties, excluding the free will, injures another, is not answerable for the injury."

The Argentine Civil Code (translated in 1917 by Frank J. Joannini, Comparative Law Bureau) reads:

"Art. 1110. In order for an act to be considered an offense it is necessary that it be the result of a free determination on the part of the author thereof. An insane person and a person under 10 years of age are not liable for the damage they cause."

The Comparative Law Bureau, under whose auspices these translations were made, gives the following annotations under the above-quoted article of the German Civil Code; Windscheid on the Pandects, § 101, No. 5; No. 13, § 54; Prussian Code, 1794 (Algemeines Landrecht) i, 6, §§ 39–41; Austrian Code, 1811, arts. 1307, 1308; Saxon Code, 1863, arts. 31, 119, 120; Hessian Project of

Codification (1841–1853) 209; Bavarian Project (1861–1864) 56; Dresden Project (1866) 213, 214; Swiss Federal Code of Obligations (1881) 50–27; Civil Code of Japan, 712, 713.

While it is generally believed that the common law prevails throughout the British Empire, it appears that the civil law obtains in Scotland, Canada, Ceylon, Java, and certain portions of South Africa. Such an extensive portion of the British Empire is under the civil law that the schools of England have encouraged and fostered the translation and compilation of numerous works in that field. Professor R. W. Lee, D. C. L. M. A., has produced a very admirable work entitled "Roman Dutch Law" (Oxford Press). We quote from page 304:

"Who are liable for Delicts: Any person is answerable for his wrongful acts if he had intelligence to understand that he was doing wrong. This excludes lunatics and young children."

He supports this statement by citing Hugo Grotius, 3.3219 and Johannes Voet, 9.2.29.47. 10. 1.

In an interesting article by Dean Rufus C. Harris of the Tulane Law School appearing in 6 Tulane Law Review, page 337, on the subject "Liability Without Fault," at page 364, we find the following:

"The chief statute of the Roman law of tort from which these code articles are derived is the Lex Aquilia. After providing that injury (injuria) is necessary to the Aquilian action, it states that:

" 'We interpret injuria as damage caused culpably even by one who did not intend the injury.'

"Further on we find:

" 'Hence the question whether there will be an aquilian action for damage by a lunatic, Pegasus denies it: "What fault (culpa) can there be in one who is not in his senses?" Which is quite true. So the Aquilian action fails as it would if an animal had done the damage—or a tile had fallen. And the same must be said if a child does the damage.' "

See, also, Rudolph Shom's "Institutes" (3d Ed. 1907) p. 213.

The following translation of section 2857, Baudry-Lacantinerie, "Obligations," book 4, is pertinent:

"The Classic Roman law is that the mentally unsound, not realizing his acts, can not commit a fault nor consequently be held to repair the damage he causes. But a decision of the Parliament of Paris of September 10th, 1683, makes one inclined to believe that our ancient jurisprudence had a tendency to hold that those of unsound mind are responsible.

"Merlin, who cites that case, adds, appearing quite clearly to place himself in harmony with the modern jurisprudence:

" 'One of unsound mind who wounds another, commits only a material "delit", nevertheless his estate is always responsible for the damages that result.' This proposition is evidently erroneous. It is contradicted by the very text of Art. 1382."

"Today the doctrine is unanimous that those of unsound mind are not responsible civilly as well as criminally except a note of discord which is found in an opinion of the court of Montpeliere, May 31, 1867, the jurisprudence is harmonious in the above result."

In Evans' translation of Pothier on Obligations we read, at page 54, vol. 1, the following:

"116. Injuries (delicta) are the third cause which produces obligations, and quasi delicta (or negligence) the fourth. * * *

"118. It results from this definition of delicta and quasi delicta, that none but persons who have the use of reason are capable of them; for infants and persons destitute of reason are not capable of either malignity or imprudence.

"Therefore if an infant or a madman does something which causes an injury; no obligation results therefrom against them, the fact is, neither a delictum or quasi delictum, as it does not include either malignity or imprudence." Part I, chapter 1, § II, sub. 2.

It is well settled that under the provisions of the Civil Code of France there is no right of recovery against an insane person for his torts.

The Civil Code of Brazil provides that only a person juridically able to perform a juridical act can be held liable for his torts and follows the distinction made by Shom's "Institutes," supra.

The soundness of the fundamental principles underlying the public policy announced by the common-law and civil law rules has been the subject of much discussion and criticism. The common-law rule is predicated on three grounds:

First, that where one of two innocent persons should bear a loss, it should properly fall on him whose act caused it; second, that imposing liability on an insane person's estate for his torts is a deterrent to the careless confining and guarding of the insane

person by relatives, or those charged with that duty; and, third, that exemption from liability would lead cunning evildoers to resort to a plea of insanity as a ruse to protect them from their nefarious work, it being difficult to prove that a person is sane.

The civil law rule is based upon the theory that recovery in tort cases is allowed upon the ground that the wrongdoer did something, or failed to do something, that ordinary care, prudence, and foresight dictated that he either should or should not have done under the circumstances, but that, since an insane person is not a rational being, he is incapable of appreciating right from wrong, or distinguishing carefulness from carelessness, and, therefore, his acts are looked upon as inevitable accidents. The common law considers the effect of the insane person's act, while the civil law regards the cause of it. The difference of view is the result of the method of approach which the two schools of thought have pursued.

Cooley, in his work on Torts (4th Ed.), vol. 1, § 65, pages 188, 189, takes issue with and criticizes the views of another writer. He states:

"One eminent law writer has doubted if there ought to be any responsibility in such a case. 'In the case of a compos mentis,' he says, 'although the intent be not decisive, still the act punished is that of a party competent to foresee and guard against the consequences of his conduct; an inevitable accident has always been held an excuse. In the case of a lunatic it may be urged both that no good policy requires the interposition of the law, and that the act belongs to the class of cases which may well be termed inevitable accident.'

"This view has plausibility, and it would be perfectly sound and unanswerable if punishment were the object of the law when persons unsound in mind are the wrongdoers. But when we find that compensation for an injury received is all that the law demands, the plausibility disappears. Undoubtedly there is some appearance of hardship—even of injustice—in compelling one to respond for that which, for want of the control of reason, he was unable to avoid; that it is imposing upon a person already visited with the inexpressible calamity of mental obscurity an obligation to observe the same care and precaution respecting the rights of others that the law demands of one in the full possession of his faculties. But the question of liability in these cases, as well as in others, is a question of policy; and it is to be disposed of as would

be the question whether the incompetent person should be supported at the expense of the public, or of his neighbors, or at the expense of his own estate. If his mental disorder makes him dependent, and at the same time prompts him to commit injuries, there seems to be no greater reason for imposing upon the neighbors or the public one set of these consequences rather than the other; no more propriety or justice in making others bear the losses resulting from his unreasoning fury when it is spent upon them or their property, than there would be in calling upon them to pay the expense of his confinement in an asylum when his own estate is ample for the purpose.

"All questions of public policy must be settled on a consideration of what on the whole is the rule that will best subserve the general welfare. * * *"

Chapin, in his work on Torts, at page 162, in commenting upon the common-law rule, said:

"It is well settled that, though a lunatic is not punishable criminally, he is liable to a civil action for any tort he may commit. However justly this doctrine may have been originally subject to criticism on the grounds of reason and principle, it is too firmly supported by the weight of authority to be disturbed."

Likewise, we say that the correctness and wisdom of the basic reasons underlying the public policy declared by these respective rules is a matter with which we have no right to concern ourselves, because we must adopt one of the two views which have been so firmly established in their respective fields in arriving at what is the proper interpretation and construction of the language in question. We must bear in mind that it is our duty to interpret the law and not to legislate. We have no right to adopt either rule solely on the ground that we might believe it to be the fairer and more equitable one. To do so would be invading the legislative prerogative.

After a careful review of the matter, it is our opinion that the very general language of article 2315 of the Revised Civil Code above quoted must be construed and interpreted in the light of its historical origin and background, and is therefore limited in its true meaning by this well-recognized rule or precept of civil law, that an insane person is not liable in damages for his tortious acts.

Finally, counsel for the plaintiff maintains that under the express provisions of article 2319, R. C. C., "which, incidentally,

was taken neither from the Code Napoleon nor from any law in force in Louisiana at the time of its introduction into the Code—it being clearly an adoption of a common law principle," the estate of an insane person is liable in damages for his torts through his curator, and, therefore, the estate of an insane person, although he is not interdicted, should be likewise responsible in damages for his wrongful act. This article reads as follows:

"The curators of insane persons are answerable for the damage occasioned by those under their care."

This article appears to be a restatement of Partidas Seventh, title IX, law 8, supra.

Article 832 of the German Civil Code reads:

"One who by authority of law, is bound to exercise control over a person, who on account of minority, or of mental or physical condition requires to be guarded, is bound to render indemnity for the injury which that person unlawfully causes to a third person. The obligation for indemnity does not occur if he complies with his duty of exercising control, or if the injury would also have happened with proper control.

"The same responsibility attaches to one who assumes control by contract."

The annotations by the Comparative Law Bureau are as follows: Windscheid on the Pandects, § 455, note 12; Prussian Code (1794) "Algemeines Landrecht," i, 6, § 57; Austrian Code (1811), arts. 1307, 1308; Saxon Code (1863) art. 779; Hessian Project of Codification (1841–53), arts. 211, 212; Bavarian Project (1861–1864) art. 627; Dresden Project (1866) art. 216; Code Napoleon, art. 1384; Swiss Federal Code of Obligations (1881) art. 61; Civil Code of Japan, arts. 712, 713.

The Civil Code of Argentine is similar and reads as follows:

"Art. 1150. Parents are not liable for the damages caused by the acts of their children if they prove that it was impossible for them to prevent such acts. This impossibility does not result from the mere circumstance of the act having occurred out of their presence if it appears that they had not exercised active watchfulness over their children.

"Art. 1151. The provisions regarding parents apply to tutors and curators, as to the acts of the persons under their charge. * * *"

The Civil Code of Brazil reads:

"Art. 1521. Also responsible for civil reparation are:

"I. Parents (os paes) for their minor children who were under their power or in their company.

"II. Tutors or Curators, for their pupils and wards, who were in the same condition."

In a work entitled "Elements of Japanese Law," by J. E. De Becker, published by the Asiatic Society of Japan, Keiogijuka Mita, and the Boston Book Co., in 1916, at page 245, it is said:

"A person who is in a state of mental alienation is not responsible for an unlawful act committed by him, but in consideration of the fact that it would bear hardly upon the injured party to leave him absolutely without any remedy if it further provided that the person who is legally charged with the duty of exercising supervision over such incapacitated person is bound to pay damages, unless he can prove that he did not neglect his duty. (Arts. 712–714, C. C. of Japan)."

In about the year 1887, Spain repealed the Partidas and the various ordinances and works which contained its laws and enacted a Civil Code, which is also the present law of Cuba, Porto Rico, and the Philippines. This Code is modeled along the lines of the Codes of the civil law countries. It was merely a restatement of the Partidas in terse and dogmatic form. The following articles therefrom are pertinent:

"Art. 1902. Any person who by an act or omission causes damage to another by his fault or negligence shall be liable for the damage so done.

"Art. 1903. The obligation imposed by the next preceding article is enforceable, not only for personal acts and omissions but also for those persons for whom another is responsible. * * *

"Guardians are liable for damages done by minors or incapacitated persons subject to their authority and living with them."

Article 1054 of the Civil Code of Lower Canada is practically identical to the foregoing provisions of the various Codes. The provisions of article 1384 of the Civil Code of France are strikingly similar. While it does not specifically mention curators of interdicts, the spirit of this article is the same as those above cited.

In Sirey's Annotations to the Civil Code we find, on page 271, vol. 3, the following annotations:

"(15) The insane and the incapables are not responsible in damages for their acts. Caen. 2 dec. 1853; Cass. 14 mai. 1866; Cass. 21 Oct. 1901; Lyon. 31 dec. 1904; Agen. 9

Nov. 1864; Aix. 7 dec. 1866; Lyon. 22 fev. 1871; Cass. 30 juil. 1906,"

and there is reference to approximately twenty commentaries in support of these annotations.

Under Article 1384, Dalloz's Annotations has the following:

"(64. The tutor is responsible for the damage caused by his pupil. Poth. n. 121.

"(66. And it is the same for the curator of the interdict. Larombiere."

The following commentaries support the view that the liability of the curator for the wrongful acts of his charge is a part of the civil law: Larombiere; Code Napoleon; Des contrats VI (1857) art. 1384, n. 6, p. 741.

We are assured by both able and diligent counsel that article 2319, R. C. C., has never been interpreted by any appellate court in this state. We do not believe that the language of the article, however, is susceptible of the interpretation placed upon it by the learned counsel for the plaintiff. Our view is that the purpose of the article is to make the curator individually and personally answerable for the damage occasioned by the insane person in his charge and not in his capacity as representative of the estate of the insane person. Whether or not the article means that the curator is liable in damages for the acts of the interdicted person only where the curator was guilty of negligence and carelessness in not properly restraining and guarding his charge, or whether he is liable in any event under the theory that he, at his peril, must prevent the insane person from wrongfully causing damage to another, is a question which we need not decide at this time. In short, it is unnecessary to a decision in this case to say if the claimant could recover against the curator individually, regardless of the fact that he was free from fault in connection with his charge's escape and wrongful injury of a third person, because, as we have already said, the language of the article does not give the claimant a right or cause of action against the estate of the interdicted person, but against the curator personally. In the instant case there is no curator, as defendant was never interdicted and the suit is against defendant.

It is interesting to note in this connection that in the case of Johnson v. Butterworth, 152 So. 166, we held that the father was responsible for the wrongful acts of his infant child under the provisions of article 2318, R. C. C., even though the father was in no way at fault. We reached this conclusion because the Legislature, in enacting article 2318, which was article 1384 of the Code Napoleon, eliminated the clause in the French law that a parent would not be liable for his child's wrongful act where he could show that he was free from fault. It must be borne in mind in reference to that case that we did not hold that the estate of the minor, who was of such tender age as to be incapable of distinguishing right from wrong, was liable, but that the child's father was responsible.

Having reached the conclusion that article 2319, R. C. C., does not give a right of action against the estate of an interdicted person for his wrongful acts, it follows that the language of the article is not sufficient to give such a right of action against the estate of an uninterdicted insane person.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.