361 So.2d 283 (1978)
Patricia Jarvis von DAMECK et al.
v.
ST. PAUL FIRE & MARINE INS. CO.
No. 12091.
Court of Appeal of Louisiana, First Circuit.
July 10, 1978.
*285 Arthur Cobb, Baton Rouge, of counsel for plaintiffs-appellants Patricia Jarvis von Dameck et al.
John W. L. Swanner, Baton Rouge, of counsel for defendant-appellee St. Paul Fire & Marine Ins. Co.
Before BLANCHE, COVINGTON and CHIASSON, JJ.
CHIASSON, Judge.
This is a wrongful death action brought by the surviving parents and siblings of Sharon Jarvis Cayer against St. Paul Fire & Marine Insurance Company (St. Paul), the liability insurer of her husband, Dr. Louis Cayer.
At approximately 3:00 o'clock P.M. on January 19, 1976, the bodies of Dr. Cayer and his wife, Sharon, were found in the bedroom of their residence in Pineville, Louisiana, by a Rapides Parish Deputy Sheriff. Autopsies revealed that the wife had received three gunshot wounds from 32 caliber bullets in the anterior chest and that the husband had received one gunshot wound from a 32 caliber bullet in the posterior pharynx at the level of the hard palate. The wife's wounds were located in the following areas, although the order in which they were received was not determined: first, one in the anterior chest in the exact midline and 5.0 cm below the sternal notch; second, one 3.0 cm below the one previously mentioned and 2.0 cm to the left of the midline; third, one at the level of the xiphoid process and 6.5 cm to the right of the midline.
The circumstances surrounding the deaths indicate an apparent murder-suicide; that having shot his wife with a 32 caliber pistol, Dr. Cayer then took his own life in the same manner. Although the time of the deaths was recorded as both being at 8:00 o'clock P.M., January 18, 1976, on the certificates of death, the autopsy reports listed the time of death of both parties as "unknown".
Suit was filed by Patricia Jarvis von Dameck, Cedric Wayne Jarvis and John T. Jarvis, the sister and brothers of Sharon Jarvis Cayer, and by Sammie Sistrunk Jarvis and Cedric Scott Jarvis, Sharon's mother and father, on April 30, 1976. In response thereto the defendant, St. Paul, filed an answer admitting the existence of certain policies issued by it to Dr. Cayer, but denying liability under the terms of the said policies. The defendant further filed peremptory exceptions of no right of action and no cause of action as to all plaintiffs, which exceptions were referred to the merits.
Finding that Dr. Cayer predeceased his wife, the trial judge overruled the exceptions of no cause of action and no right of action as to the parents on the basis of La.R.C.C. Article 2315. As to the brothers and sister, the exceptions were sustained and their claims were dismissed. The trial judge further found that although the plaintiffs proved that Dr. Cayer was insane at the time he shot his wife, that the defendant had carried its burden of proving *286 that the act of Dr. Cayer was intentional and that the policies issued by the defendant to Dr. Cayer excluded coverage in the case of intentional injuries.
Finally, the trial judge found that it would not make any legal difference whether Dr. Cayer was sane or insane at the time for the following reasons:
"A. If the doctor was sane, his actions were intentional, thereby excluding coverage.
"B. If the doctor was insane, he would be immune from legal liability, ipso facto making his insurer immune."
Accordingly, judgment was rendered dismissing the claims of plaintiffs.
From said judgment all plaintiffs have appealed devolutively.
Plaintiffs contend that the trial judge erred in the following respects:
1. In finding that an insane person is capable of committing an intentional tort;
2. In following the decision of Yancey v. Maestri, 155 So. 509 (Orl.App.1934) to reach his conclusion that an insane person will not be held liable for his torts;
3. In finding that a liability insurer is not liable for the torts committed by its insured while insane;
4. In dismissing the claims of the sister and brothers of Sharon Jarvis Cayer.
Plaintiffs first contend that the finding of the trial judge that Dr. Cayer intended to shoot and kill his wife is contrary to the law and evidence inasmuch as the defendant failed to discharge its burden of proving such, and inasmuch as the trial judge expressly found that the plaintiffs met their burden of proving that Dr. Cayer was insane at the time of the shooting.
The law in Louisiana is well settled that all persons are presumed to be sane unless the contrary is affirmatively established. Kalpakis v. Kalpakis, 221 La. 739, 60 So.2d 217 (1952); Succession of Vicknair, 126 So.2d 680 (La.App. 4th Cir. 1961), certiorari denied. However, to this court's knowledge a legal standard of insanity, insofar as delictual responsibility is concerned, has never been established by the jurisprudence or laws of the State of Louisiana.
"Insane persons" are defined in La.R.C.C. Article 31 as:
"Persons of insane mind are those who do not enjoy the exercise and use of reason, after they have arrived at the age at which they ought, according to nature, to possess it, whether the defect results from nature or accident. This defect disqualifies those who are subject to it, from contracting any species of engagement, or from managing their own estates, which are for this reason placed under the direction of curators."
"Insanity" is defined in Black's Law Dictionary 929 (4th Ed.Rev. 1968), as:
". . . such a want of reason, memory, and intelligence as prevents a man from comprehending the nature and consequences of his acts or from distinguishing between right and wrong conduct."
In the recent case of Turner v. Bucher, 308 So.2d 270 (La.1975), the Supreme Court, in discussing the delictual responsibility of minors and insane persons, stated the following:
". . . (T)he Louisiana and French concepts coincide in holding that nondiscerning persons do not possess the capability of knowing the consequences of their conduct; they lack the moral guilt usually associated with delictual responsibility and, therefore, they should not be legally liable for acts under an objective standard designed for normal reasoning persons." (Footnote omitted).
Expert medical testimony as to the mental condition of Dr. Cayer at the time of the murder-suicide was elicited from two psychiatrists Dr. Curtis A. Steele for plaintiff, and Dr. Francisco A. Silva for defendant. Dr. Cayer had no prior record of mental instability. Neither psychiatrist had ever had the opportunity of examining or talking to Dr. Cayer and their testimony was based exclusively upon the following: certain writings by Dr. Cayer which were introduced into evidence, the testimony of *287 Dr. Cayer's in-laws as to his character and certain conduct on the part of Dr. Cayer described as bizarre, and certain stressful situations to which Dr. Cayer was subjected in the months immediately preceding his death.
The writings of Dr. Cayer consist of undated notes written on hospital or medical stationery. They were described by Dr. Steele as ". . . highly disordered notes that had a consistent trend of competitiveness, suspiciousness, macho male supremacy, very disorganized, rambling thoughts on how to dominate and control women, that in themselves are disorganized to the point of sounding psychotic." Dr. Silva described the notes as evidencing feelings of inadequacy and male chauvinism, and an obsessive preoccupation with women, how to deal with them, and not allowing them to control you.
The testimony of the other witnesses who testified established the following bizarre episodes and stressful situations and/or traumas to which Dr. Cayer was subjected during his lifetime:
1. That when he was sixteen years old, Dr. Cayer's father died of a heart attack at a time when his mother and sisters were away from home and while he and his father were alone, he being unable to help his father at the time;
2. That Dr. Cayer blamed his mother for his father's death, and hated her for it;
3. That while a child or a teenager, in a very heavy argument with his sister, Dr. Cayer stabbed her with a pair of scissors near the eye for which she had to have stitches;
4. That after his marriage to Sharon Jarvis, at a social gathering Dr. Cayer was involved in a heated argument with his sister-in-law, and receiving the worst end of the argument, he ranted and raved, ran out, and started kicking and punching his own automobile;
5. That after his marriage and about the same time as the previously related incident while his mother-in-law was visiting with the couple, she heard screaming in the middle of the night, ran out of her room, and found Dr. Cayer standing naked in front of a picture window with the lights on screaming he was superman and super-doctor;
6. That during the month of August, 1975, his wife left him and went home to her mother;
7. That Dr. Cayer carried a gun with him because he thought there were people out to get him;
8. That in November of 1975 he told his mother-in-law that he had gout, that he didn't want anyone else to know about it, and that if it turned into arthritis he might kill himself;
9. That every year around the anniversary of his father's death, Dr. Cayer became depressed for a few days;
10. That the day the bodies of Dr. Cayer and his wife were found, January 19, 1976, was the anniversary date of his father's death;
11. That approximately two weeks prior to his death, Dr. Cayer expressed concern about suffering a diminution of income in the amount of approximately $50,000.00 per year because the hospital where he worked hired its own emergency room doctor;
12. That as a result of the previously mentioned factor, Dr. Cayer cancelled his plans to make a $300,000.00 addition to his own clinic.
13. That a few days after his death, Dr. Cayer was to appear in court as a defendant in his first medical malpractice case;
14. That Dr. Cayer's body was found in bed completely naked and the body of his wife was found clad only in a short negligee.
Both psychiatrists agreed that in their opinions, based upon the writings alone, Dr. Cayer was a paranoid person. "Paranoia" is defined in Black's Law Dictionary, id, at pages 934 and 935 as:
"Monomania in general, or the obsession of a delusion or system of delusions which dominate without destroying the mental capacity, leaving the patient sane as to all matters outside their particular range, though subject to perverted ideas, false *288 beliefs, and uncontrollable impulses within that range; and particularly, the form of monomania where the delusion is as to wrongs, injuries, or persecution inflicted upon the patient and his consequently justifiable resentment or revenge. Winters v. State, 61 N.J.L. 613, 41 A. 220; People v. Braun, 158 N.Y. 558, 53 N.E. 529. Paranoia is called by Kraepelin `progressive systematized insanity,' because the delusions of being wronged or of persecution and of excessive self-esteem develop quite slowly, without independent disturbances of emotional life or of the will becoming prominent, and because there occurs regularly a mental working up of the delusion to form a delusionary view of the world, in fact, a system, leading to a derangement of the stand-point which the patient takes up towards the events of life."
Both psychiatrists also agreed, in effect, that while paranoid persons are capable of functioning adequately within certain social ranges, they are not capable of functioning adequately within other social ranges, i. e., within the particular social ranges that are affected by the individual's paranoid condition. Dr. Steele testified that in his opinion Dr. Cayer was psychotic as well. Dr. Silva deposed that, inasmuch as he had not had the opportunity of examining Dr. Cayer, he could not say to what extent the stresses to which Dr. Cayer was subjected affected him.
Although the testimony of the medical experts is in conflict over whether or not there was sufficient information for them to determine from a medical standpoint the severity of Dr. Cayer's mental condition at the time of the shootings, the trial judge found that from a legal standpoint, Dr. Cayer was insane at the time.
On the basis of the above evidence and legal definitions, we agree with the trial judge that Dr. Cayer was a paranoid psychotic person. We find that although Dr. Cayer was apparently capable of functioning adequately within certain social ranges, e. g. at work, he was incapable of functioning adequately within other social ranges, i. e., while at home or away from work and, in particular, with women. We further find that the stresses to which he was subjected in the months just prior to his death, caused him, while at home with his wife, to lose the ability to reason and/or understand the nature and consequences of his actions to such a degree that under the law he was legally insane at the time. Accordingly, we find that the trial judge's conclusion that Dr. Cayer was insane is amply supported by the evidence.
In view of the above jurisprudence and definitions of insanity for civil liability, we find that the trial judge was in error in simultaneously concluding that Dr. Cayer, by his actions, intended to inflict bodily injury. If a person has such a want of reason, memory, and intelligence as prevents him from comprehending the nature and consequences of his acts, he cannot at the same time intentionally inflict injury. Though Dr. Cayer may have had the intent to shoot his wife, his insanity prevented him from having the requisite intent to inflict injury.
Further, an insurer has the burden of proving its right to urge an exclusion under its policy as a defense. Briley v. Union National Life Insurance Co., 246 So.2d 265 (La.App. 1st Cir. 1971), writ refused. In Written Reasons for Judgment the trial court concluded that the defendant, having proven the act to be intentional, can take advantage of the exclusion. The exclusions in the policies apply "to bodily injury . . . which is expected or intended from the standpoint of the insured." (underscoring added). The only testimony offered to establish that Dr. Cayer intended to inflict injury upon his wife was that of Dr. Steele on cross-examination to the effect that Dr. Cayer probably did intend to injure her. However, this testimony is subject to Dr. Steele's consistent opinion and belief that Dr. Cayer was not rational and was not capable of cause and effect thinking at the time of the act.
The trial judge's conclusion was based, in part, also upon the presumption *289 that all persons intend the natural and probable consequences of their acts. Presumptions are consequences which the law or the judge draws from a known fact to a fact unknown. La.R.C.C. Art. 2284. The judge ". . . ought to admit none but weighty, precise and consistent presumptions." La.R.C.C. Art. 2288. Objective standards designed for normal reasoning persons should not apply to persons incapable of discernment. See: Turner v. Bucher, supra. The presumption, that one intends the natural and probable consequences of his acts, should be limited to those persons capable of discernment and should not be applied to an insane person.
For the above reasons we find that the trial judge erred in holding that the defendant carried its burden of proof to establish that plaintiffs' claims came within the exclusionary provisions of its policies.
Plaintiffs next contend that the trial judge erred in following the decision of Yancey v. Maestri, supra, to the effect that an insane person cannot be held liable for his torts, and further in holding that a liability insurer is not liable for the tort committed by its insured while insane.
Even assuming, arguendo, (and without commenting on the continuing validity of the Yancey decision) that an insane person is not liable for his torts, the defense is personal to the insured. Simmons v. Clark, 64 So.2d 520 (La.App. 1st Cir. 1953). Personal defenses are not available to the insurer. Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191, (1935); Ruiz v. Clancey, 182 La. 935, 162 So. 734 (1935).
Finally, plaintiffs contend that the trial judge was in error in sustaining the defendant's exception of no right of action as to the brothers and sister of Sharon Cayer. Since, under La.R.C.C. Article 2315, each of the three separate classes of beneficiaries successively excludes the following class or classes, it is clear that the claim of the parents of Sharon Cayer excludes the claims of her brothers and sister. See: Johnson v. International Insurance Company, 347 So.2d 1279 (La.App. 1st Cir. 1977), writ denied. Accordingly, the brothers and sister have no right of action and the judgment of the trial court in this respect is correct.
In view of our findings heretofore, we turn to a consideration of the defendant's contention, in brief, that the trial judge was in error in finding that Dr. Cayer predeceased his wife. Defendant submits there is no factual basis for this finding and that it was based solely upon an assumption by the trial judge that Sharon Cayer attempted to crawl out of the bed after Dr. Cayer had administered the instantly fatal shot to himself. The only medical testimony offered to establish the sequence of deaths was that of a pathologist, Dr. Albert L. McQuown, defendant's expert witness. His testimony was based on a review of the autopsy reports which were prepared by Dr. Tom D. Norman. Dr. McQuown testified that although there was no medical evidence to absolutely state who died first, it was his opinion, based upon his experience, knowledge and the autopsy reports, that Sharon died first.
The factual basis for the trial court's conclusion is supported by the testimony of the investigating officer, the position of the bodies when discovered, and the photographs of record. Because there is credible evidence to support the finding of the trial court, we find no manifest error in its determination of this issue.
We are therefore of the opinion that the parents are entitled to collect damages for the death of their daughter. Because the record contains all the facts necessary to arrive at the quantum of damages, it is incumbent upon us to make that determination. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).
In this respect the record reflects that at the time of her death, Sharon Cayer was 22 years old, married and living away from home with her husband for nearly two years. Nevertheless, there was evidence that Sharon was very close to her parents throughout her lifetime. They devoted much of their time to providing Sharon *290 with a good education and proper upbringing, and they supported her in extracurricular school activities and in church functions. The record further discloses that she returned the love and affection that her parents bestowed upon her by being a model daughter to them. She excelled in her endeavors and was described by her mother as an affectionate child who was "always in the lead." She was valedictorian of the senior class in high school, president of the Student Council, FHA Girl of the Year, president of the 4-H Club, band mascot, cheerleader, senior maid, active in church functions (church organist for five years), and an active participant in athletic functions.
Finally, the evidence discloses that after her marriage, Sharon remained in close contact with her parents by telephone, letters and frequent visits, despite the fact that they lived some distance away.
While it is most difficult to assess a monetary value to compensate for damages of this nature, we are of the opinion that an award to each parent in the amount of Twenty Thousand and No/100 ($20,000.00) Dollars is justified under the circumstances of this case.
Accordingly, the judgment of the trial court sustaining defendant's peremptory exception of no right and no cause of action as to the claims of Patricia Jarvis von Dameck, Cedric Wayne Jarvis, and John T. Jarvis is affirmed, and in all other respects, the judgment is reversed.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs, Sammie Sistrunk Jarvis and Cedric Scott Jarvis, and against defendant, St. Paul Fire & Marine Insurance Company, in the full and true sum of Twenty Thousand and No/100 ($20,000.00) Dollars, each, with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.